CORBETT, Respondent, vs. JOANNES and others, Appellants.

*May 6—June 23, 1905.*

*Insolvency: Rights of secured creditors: Dividends: Constitutional law: Contracts: Compromise: Parol evidence.*

1. In the administration of a general trust for creditors under judicial supervision, as in case of a receivership matter or an assignment for the benefit of creditors, one who holds security for the payment of his claim has, nevertheless, to the extent of the full face of such claim at the date of the creation of the trust, the same status regarding the distribution of the trust fund as an unsecured creditor; and he is entitled to dividends accordingly and to the benefit of his security as well until the avails from both shall have been sufficient to fully discharge the indebtedness, the residue of the security, if any, to be then covered into the trust fund.

2. A creditor holding security, in the absence of an assignment or other trust for creditors, may enforce it for the purpose of thereby collecting his claim, or resort to the general assets of the debtor as he sees fit; and this privilege is a property right which cannot be taken away by any mere act of the debtor, or in any manner, without the creditor's consent, in the absence of some statutory regulation to the contrary existing at the time of the creation of the debtor relation.

3. The remedy afforded for the enforcement of an indebtedness existing at the creation thereof is a property right so within sec. 10, art. I, of the federal constitution that legislative authority is not competent to change it so as to materially impair the value of such indebtedness.

4. Under assignments for the benefit of creditors the right of a secured creditor in the trust fund is a thing somewhat distinct from the indebtedness itself. The debt as it existed at the time of the creation of the trust is regarded as the measure of the proportional interest of the creditor as a *cestui que trust* in the trust fund, while it has a separate existence as regards the security till it is paid or the security exhausted. Payments thereon, whether from the trust fund or from the security, reduce the same, but do not change in any respect the basis of the beneficiary right so long as any part of the indebtedness remains unpaid.

5. A proposition in writing by or on behalf of one to another and accepted by or on behalf of the latter, each suggestion being

on a separate piece of paper and not expressed in any formal way, yet so that the two show a meeting of minds upon some particular subject matter, and the parties assuming to act as agents in the matter, if there be such, being duly authorized thereto, make a good contract.

6. Where a committee, authorized to represent an insolvent and the owners of ninety per cent. of the liabilities, made a written proposition to all creditors for a compromise and settlement of their claims, and, pursuant thereto, the insolvent deposited the necessary funds with a mutual agent, and thereafter one creditor, by letter addressed to such agent, accepted the proposal, a written agreement was made as completely as if what was expressed in the two papers had been reduced to writing in one and signed by the debtor and creditor.

7. A composition with creditors was made with reference to the status of the creditors in a voluntary assignment proceeding and the opportunity afforded the debtor to judicially obtain his discharge from personal liability. *Held*, that it was incompetent to show that the compromise agreement was a mere part performance of a previous entire oral contract and precluded showing the latter.

8. Where there is a distinct oral agreement which, under ordinary circumstances, could not be efficiently established in the face of a written one, it may be established in an action between the parties as matter of defense, when one seeks to use the writing in a way to effect a dishonest or fraudulent purpose.

APPEAL from a judgment of the circuit court for Brown county: SAMUEL D. HASTINGS, Circuit Judge. *Reversed.*

The following is the substance of the complaint:

*First cause of action.* November 11, 1901, plaintiff being largely indebted to defendants as firm of Joannes Bros., and having two real-estate mortgages, for the purpose of paying defendants, in part, it was mutually agreed that he should release such mortgages; that the property affected thereby should be conveyed to the defendants; that they should hold the same until an advantageous sale thereof could be made; and the proceeds of such sale up to $3,164.90 should then be credited upon his indebtedness as of July 19, 1902, and the balance be paid to him. A sale was made pursuant thereto October 15, 1903, defendants realizing the net amount of

$5,300, of which $2,135.10 was payable to plaintiff as per agreement and is due and owing to him with legal interest from October 15, 1903.

*Second cause of action.* February 8, 1897, plaintiff being the owner of a mortgage on certain real estate subject to a prior mortgage, about to be enforced at a foreclosure sale, defendants, at his request, advanced $2,075 with which to bid in the property under an agreement that he should resell the same as soon as practicable; that out of the proceeds the sum so advanced with legal interest should be repaid and the balance should belong to the plaintiff. July 2, 1902, the property was resold, defendants realizing $3,550. There was then due defendants on account of the deal $1,463.63, leaving a balance of $2,086.37 payable to the plaintiff, which they have refused to pay.

*Third cause of action.* Plaintiff sold to defendants certain real estate for the sum of $600, on account of which such sum became payable to him July 21, 1902, but has not been paid. Judgment was demanded for the various amounts mentioned, with interest upon each from the due date thereof as indicated.

Defendants answered to this effect: November 11, 1901, the mortgages and the indebtedness secured thereby, mentioned in the first cause of action, were held by defendants as collateral security for the payment of indebtedness owing by plaintiff to defendants. On such date to avoid the expense of foreclosing such mortgages, and other purposes herein stated, it was agreed by all the parties interested that the title in fee of the mortgaged premises should be conveyed to defendants; that they should hold the same until a sale thereof could be made, and that the proceeds of such sale should be applied, so far as the same would go for that purpose, in payment of any indebtedness then existing of plaintiff to defendants, or Joannes Bros. Co., and the balance, if any, be paid to plaintiff, and that in the meantime the premises should be leased to L. Howland, the mortgage debtor, for

$1, for the period of one year and a half from and after November 21, 1901. The property was so transferred. July 19, 1902, it was agreed between plaintiff and defendants that the net value of such property was $3,164.90, and that at such sum the same should be taken by the latter and the purchase price should be credited to the former upon the indebtedness aforementioned, and it was so credited, leaving a large balance of such indebtedness still unpaid.

As stated in plaintiff's second cause of action, February 8, 1897, defendants advanced $2,075.36 with which to buy certain real estate at a foreclosure sale to protect plaintiff as second mortgagee. As a part of the transaction it was mutually agreed between the parties that the property should be bid in at such sale; that the title thereto should be taken and held by M. Joannes till the same should be resold; that out of the proceeds of the sale when made defendants should be repaid the $2,075.36, and the surplus, if any, should be credited upon plaintiff's then indebtedness to the defendants and that to Joannes Bros. Co. in case of there being such. The title to the property was vested in M. Joannes accordingly. Pursuant to such agreement, August 4, 1902, the property was resold for $3,424, which at plaintiff's request was applied as per such agreement.

July 21, 1902, plaintiff was indebted to Joannes Bros. in the sum of $2,518.85, and Joannes Bros. Co. in the sum of $5,412.38. He was then insolvent and desired to compromise with all his creditors, to whom he owed in the aggregate $11,568.40. On such date it was agreed between defendants and Joannes Bros. Co. on the one side and plaintiff on the other that he should pay them thirty-five per cent. of the face of their claims against him, they retaining as their own property the proceeds of all collateral held by Joannes Bros. in settlement of such claims. That agreement was carried out. The collateral included the $600 mentioned in plaintiff's third cause of action. Such $600 was the value of certain real estate owned by plaintiff but held by defendants as

collateral. Judgment was demanded for a dismissal of the complaint with costs.

The property mentioned in the second cause of action was denominated on the trial and will be spoken of here as the "Glass property." The third cause of action was abandoned. There was evidence establishing or tending to establish the following: Plaintiff and defendants agreed that the property mentioned in the first cause of action, at an appraised value of $3,164.90, should be applied on the indebtedness of the former to the latter and Joannes Bros. Co., and the same was so applied before the making of the assignment hereafter referred to, leaving a balance of such indebtedness of $7,931.23, not counting the advancement made to buy in the Glass property. Whether such advancement, under the circumstances, created an indebtedness was on the pleadings and evidence a matter in controversy. It was agreed between plaintiff and defendants that while *M. Joannes* held the title to the "Glass property" plaintiff should keep down taxes, keep up the repairs thereon, and pay $18 per month to defendants. That agreement was carried out for a period of sixty-two months. It was a matter of controversy whether the monthly payments should be considered as rent, or for the use of, or to apply on the advancement of $2,075.36. In July, 1902, plaintiff, by advice of defendants, made an assignment for the benefit of his creditors. The amount of his assets available for general creditors was $5,601.12, and the amount of his liabilities, including those to defendants and Joannes Bros. Co., exclusive of the $2,075.36 aforesaid, was $11,568.40. After such assignment was made and the amount of the liabilities and assets was known as aforesaid, the defendants promoted a compromise of such liabilities at thirty-five cents on the dollar, not disclosing to other creditors the fact that they had a considerable amount of collateral. None of the collateral was listed as a part of the assets in the assignment proceedings.

The defendants suggested to the plaintiff not to disclose to the other creditors the existence of the collateral as it might influence them unfavorably pending the negotiations for the thirty-five per cent. compromise. Defendants converted the "Glass property" into money, realizing $3,419.64. Such conversion was accomplished by two sales. The first netted $2,424.64. Thereafter and before the second sale it was agreed between plaintiff and defendants that the latter and Joannes Bros. Co. should have the entire proceeds of the property and share equally with the other creditors in the thirty-five per cent. compromise as a condition of their claims being released. The arrangement was freely made on plaintiff's part. Through the influence of defendants a meeting of plaintiff's creditors was held at defendants' place of business to consider the question of making a composition agreement. A committee of creditors was appointed at such meeting to confer with the plaintiff and consider the statement of assets and liabilities reported by the assignee. It was understood at the time the committee was created that they were to report to the creditors at a subsequent meeting their judgment as to what was for the best interests of the creditors. Such proceedings were taken by the committee in conjunction with the plaintiff that a written proposition was made by the latter and its acceptance was recommended in this form:

"August 14th, 1902.

"We, the undersigned committee appointed for the purpose of investigating the matters of *M. J. Corbett,* assigned, have come to an understanding and agreement with him to recommend a settlement with all creditors on the basis of thirty-five per cent.                    F. G. STRAUBEL,

"W. L. EVANS,

"PHIL B. SMITH,

"Committee.

"I agree to the above and promise to pay the percentage named above, upon acceptance of creditors.

"M. J. CORBETT."

· The report was placed before a second meeting of creditors, held August 14, 1902, for consideration and was approved by all present, ninety per cent. of all the liabilities being represented, including those of defendants and Joannes Bros. Co. After such approval a second committee was appointed by the creditors to execute the composition and to properly bring the matter to the attention of all persons interested. Pursuant thereto such committee made and sent to each and every creditor a notice and proposition in the following form: ·

"GREEN BAY, Wis., August 16th, 1902.
*"To the Creditors of M. J. Corbett, Assignor:*

"At a meeting of creditors held on July 31st, the assignee made a report showing liabilities and resources as follows:

| | | |
|---|---:|---:|
| Amount of stock on hand................................ | $2,225 | 53 |
| Amount of good accounts................................ | 1,978 | 59 |
| Amount of doubtful accounts........................... | 317 | 00 |
| Amount of horses, wagons, sleighs, etc................. | 360 | 00 |
| Amount of store fixtures and furniture................. | 720 | 00 |
| | $5,601 | 12 |

Amount of liabilities due creditors....................$11,568 40

"At said meeting a committee composed of F. G. L. Straubel, of Weise-Hollman Company, Wholesale Crockery; F. B. Smith, of Smith Brothers, Merchants and Market Gardeners; W. L. Evans, of Sheridan & Evans, Attorneys, was appointed for the purpose of investigating the reports, and on August 14th to report at a creditors' meeting what in their judgment should be done for the best interest of the creditors.

"At said meeting the committee reported that *Mr. Corbett* had induced some parties to make an offer of thirty-five per cent. cash in full settlement of all claims and the committee recommended that it be accepted. The offer was accepted by all present, representing about ninety per cent. of all the creditors, and the undersigned committee was appointed to notify the creditors of said offer and arrange for the settlement.

"We have therefore arranged with the McCartney National Bank of this city to act as a trustee in this matter, to whom all claims should be sent duly receipted in full, and as

·soon as all the creditors have accepted the offer the amount ·due them will be promptly paid.

"In the event of any creditor declining the offer, it will make it necessary for the receiver to close out the business and pay each creditor his share of the net proceeds, and *Mr. Corbett* could then file a petition in bankruptcy and be discharged of his debt. With the above facts this committee recommends a prompt acceptance of *Mr. Corbett's* offer.

"Very respectfully yours,<br>
"WILLIAM LARSON,<br>
"FRED A. HOLLMAN,<br>
"THOMAS JOANNES."

Thereafter plaintiff deposited money in the bank mentioned in such notice in compliance with the terms thereof and all the creditors, with the exception of Swift & Co., accepted their respective percentages and released their claims, none of them, except defendants and Joannes Bros. Co., having knowledge of the arrangement whereby the latter were to have the benefit of the collateral in their hands in addition to their percentage, or knowledge that there was any such collateral. Swift & Co. were paid the full amount of their claim by the advice of *M. Joannes.* Defendants converted to their own use, and the use of Joannes Bros. Co., the proceeds of the "Glass property," and thirty-five per cent. in addition upon the face of their claims was paid for a release thereof. They sent such claims to the bank, which acted as disbursing agent in the matter, to be settled in accordance with a letter of advice, of which the following is a copy:

"GREEN BAY, Wis., 8—2—1902.

*"McCartney National Bank, City:*

"GENTLEMEN: We enclose statement of Joannes Bros. Co. against *M. J. Corbett* for $5,412.38; also statement of Joannes Bros. for $2,518.85. We have also attached to each statement the promissory note described in the statements. On payment of thirty-five per cent. of the amount of each claim in cash, you may deliver these statements and notes to *Mr. Corbett.* The above is in accordance with the compro-

mise offer made by him to all his creditors; and our accept-
ance of the compromise is on the condition that each and every·
one accept this compromise offer and that the same shall be
paid within thirty days from date hereof; otherwise the
statements and notes are to be returned to us promptly.

"Very truly yours,

"JOANNES BROS. CO.

"Dic. by *Mr. Mitchell Joannes,* Pres."

The jury found specially, in substance: July 19, 1902, it·
was agreed between plaintiff and defendants that the latter
should take the property mentioned in the first cause of ac-
tion and give the former a credit therefor of $3,164.90 on
account. (2) The Glass property was bid in at a foreclosure
sale by plaintiff in the name of *Mitchell Joannes* to be held
as security for the repayment by plaintiff of the advances.
made by defendants of $2,075.36 and interest. (3) Plaint-
iff paid defendants $18 per month for sixty-two months as.
rent on the Glass property while *M. Joannes* held the same.
(4) It was agreed between plaintiff on one side and the de-
fendants and Joannes Bros. Co. on the other that the latter·
should accept thirty-five per cent. upon the face of their
claims, aggregating $7,931.23, and the collateral held to se-
cure the same, in full settlement thereof. (5) The agree-
ment was not made during the negotiations for a general
compromise of plaintiff's indebtedness. (6) Such agree-
ment was not concealed by the defendants or plaintiff from
the creditors participating in the composition agreement for·
the purpose of inducing them to do so.

Both sides moved for judgment on the special verdict.
The motion of the defendants was denied. The court de-
cided, notwithstanding the verdict, but without changing any
answer therein, that the agreement between plaintiff and de-
fendants that they and Joannes Bros. Co. should share
equally with the other creditors in the thirty-five per cent.
composition and have the proceeds of the Glass property in
addition, was made pending the negotiations with such other

creditors, and that it was an agreement for a secret advantage over the other parties to the composition,—a preferential agreement, and therefore void, rendering defendants liable to pay plaintiff the amount realized out of the Glass property; that there was no written composition agreement; that the advancement of $2,075.36 to buy in the Glass property was a loan; that in determining the net proceeds of such property the $2,075.36 should be charged to the plaintiff as a loan at the legal rate of interest, and that the rent paid, as found in the verdict, should be applied to the payment of such interest, so far as necessary to discharge the same, and the balance upon the principal, and that the net result was an indebtedness to the plaintiff of $2,138.73, for which he was entitled to judgment with costs. Judgment was rendered accordingly.

For the appellants there was a brief by *Wigman, Martin & Martin,* and oral argument by *P. H. Martin.*

For the respondent there was a brief by *Greene, Fairchild, North & Parker,* and oral argument by *H. O. Fairchild.*

MARSHALL, J. This cause seems to have proceeded up to the close of the oral argument here on the mistaken theory that in case of an assignment for the benefit of creditors, one holding a secured claim cannot share with the general creditors *pari passu* without covering his security into the trust fund; that otherwise his status as a beneficiary is to be determined by the face of his claim at the date of the assignment less the value of his security. Hence for the assignor not to report the collateral as part of the trust fund, or for the secured creditor to participate in the trust or in any proceeding based on his beneficiary interest therein, not disclosing the existence of the security, is necessarily fraudulent. The law was distinctly declared here to be otherwise in *Harrigan v. Gilchrist,* 121 Wis. 127, 344, 99 N. W. 909. It was there held that in the administration of a general

trust for creditors under judicial supervision, as in case of a receivership matter or an assignment for the benefit of creditors, one who holds security for the payment of his claim has, nevertheless, to the extent of the full face of such claim at the date of the creation of the trust, the same status regarding the distribution of the trust fund as an unsecured creditor; that he is entitled to dividends accordingly and to the benefit of his security as well till the avails from both shall have been sufficient to fully discharge the indebtedness, the residue of the security, if any there be, to be then covered into the trust fund.' The reason for that is this: A creditor holding security, in the absence of an assignment or other trust for creditors, may enforce it for the purpose of thereby collecting his claim, or resort to the general assets of the debtor as he sees fit. That privilege is a property right which cannot be taken away by any mere act of the debtor or in any manner without the creditor's consent, in the absence of some statutory regulation to the contrary existing at the time of the creation of the debtor relation. The remedy afforded for the enforcement of an indebtedness existing at the creation thereof is regarded as a property right so within the inhibition of sec. 10, art. I, of the federal constitution that legislative authority is not competent to change it so as to materially impair the value of such indebtedness. *Peninsular L. & C. Works v. Union O. & P. Co.* 100 Wis. 488, 76 N. W. 359; *Eau Claire Nat. Bank v. Macauley,* 101 Wis. 304, 77 N. W. 176; *H. W. Wright L. Co. v. Hixon,* 105 Wis. 153, 80 N. W. 1110, 1135.

We shall not discuss at length anew the subject, which was decided, as suggested, in *Harrigan v. Gilchrist, supra.* A large number of authorities are there referred to, including recent decisions of the supreme court of the United States. In some of the latter it will be seen that the matter was exhaustively treated. Courts are in substantial, though not in entire, harmony in respect to this matter. The slight want

of harmony grows out of instances where the rule in bankruptcy was followed without appreciation that it is grounded on federal statutes; or by erroneously applying the equitable doctrine, that where a person has a lien on two funds for the payment of his claim and another has a lien on one of them, the former must first exhaust his remedy as to the fund in which his right is exclusive.

Justice FULLER discussed the general subject we have here at considerable length in *Merrill v. Jacksonville Nat. Bank,* 173 U. S. 131, 19 Sup. Ct. 360, using this language:

"The secured creditor is a creditor to the full amount due him, when the insolvency is declared, just as much as the unsecured creditor is, and cannot be subjected to a different rule. And as the basis on which all creditors are to draw dividends is the amount of their claims at the time of the declaration of insolvency, it necessarily results, for the purpose of fixing that basis, that it is immaterial what collateral any particular creditor may have. The secured creditor cannot be charged with the estimated value of the collateral, or be compelled to exhaust it before enforcing his direct remedies against the debtor, or to surrender it as a condition thereto, though the receiver may redeem or be subrogated as circumstances may require."

"When secured creditors have received payment in full, their right to dividends, and their right to retain their securities cease, but collections therefrom are not otherwise material. Insolvency gives unsecured creditors no greater rights than they had before, though through redemption or subrogation or the realization of a surplus they may be benefited."

In applying the doctrine thus established courts treat the right of a secured creditor in the trust fund as a thing somewhat distinct from the indebtedness itself. The debt as it existed at the time of the creation of the trust is regarded as the measure of the proportional interest of the creditor as a *cestui que trust* in the trust fund, while it has a separate existence as regards the security till it is paid or the security exhausted. Payments thereon whether from the trust fund

or from the security reduce the same but do not change in any respect the basis of the beneficiary right so long as any part of the indebtedness remains unpaid. To illustrate, in *Patten's Appeal,* 45 Pa. St. 151, the case was this: A person at the time of an assignment of another for the benefit of his creditors held the latter's notes to the extent of $23,420.39 on account of indebtedness for sugar, with the right of stoppage *in transitu* as to the greater part of the property. That right was subsequently exercised. The sugar was held as security for the payment of the notes. Upon the notes maturing the sugar was sold, $21,026.28 being realized therefrom, leaving a debt of $2,394.11 unpaid. Subsequently the creditor claimed the right to participate with the other creditors in the distribution of the trust fund on the basis of the face of his claim as it existed at the date of the assignment, and it was held that such was his clear legal right so long as the dividends did not overpay the aforesaid balance. The decision is to the effect that in such a case the effect of the assignment is to convey such an equitable interest in the assignor's general assets to each creditor as the amount of his claim bears to the total proved indebtedness of the assignor, and that such equitable interest is no more affected as to any creditor by his having other security for the payment of his claim received from the debtor before the assignment than it would be by his holding the property of a stranger as such security.

*Graeff's Appeal,* 79 Pa. St. 146, is mentioned in the elementary books as a very significant illustrative case. The assignor for the benefit of creditors at the date of the assignment was indebted on three judgments which were liens on real estate. Such liens were enforced, sufficient being realized to pay two of the judgments and a part of the third. Application of the proceeds was made accordingly. Notwithstanding that it was held that the creditor was entitled to share with the general creditors on the basis of the aggre-

gate of the three judgments as they stood at the date of the assignment; that the creation of the trust made every creditor having several claims an equitable owner of the general assets of the assignee in the proportion which ·his several claims as they existed at the date of the assignment, merged in one, bore to the entire indebtedness of the assignor; that he was not to be regarded as having a separate beneficiary right for each particular claim; that such a beneficiary right in a trust fund is one thing and the creditor's right as regards security held by him at the time of the assignment is another, and that payments in one capacity cannot prejudice the right in the other, so long as anything remains unpaid of the indebtedness. Many similar illustrative cases could be given. The text-writers state the matter this way:

"What the creditor holds as security is so much additional to the personal obligation of the debtor. In order that the secured may retain the entire benefit of his security, he must be permitted to prove upon the entire debt, otherwise some part, either of the debt or the security, is destroyed without his consent. It is upon these grounds that the rule, as stated above, has finally prevailed." Bishop, Insolvent Debtors (3d ed.) 533.

So far as the misconception of law suggested ruled this case, resulting in the conclusion complained of, it is plainly wrong. It may possibly be that in a case where no trust for creditors has been created with the double relation of secured and unsecured creditors, as above indicated, and all creditors without reservation join in compromising their claims, secured creditors ostensibly sharing in misfortune equally with others, but having an understanding with the debtor that their rights as to the security shall not be prejudiced thereby,—such understanding would be subject to condemnation as fraudulent. It might well be said in such circumstances, omitting the element of concert of action between the favored creditors and the debtor, that the consummation of the compromise agreement as to the latter, they re-

ceiving the compromise amount and surrendering their evi-
dences of indebtedness, or formally discharging the debtor,
would leave the collateral in their hands as the latter's prop-
erty. It may also well be that if the element of outside-
agreement for retention by secured creditors of their collat-
eral, notwithstanding the execution of the composition agree-
ment, was verbal and the latter's agreement was in writing,
under ordinary circumstances at least, it would not be permis-
sible to avoid the effect of the writing by giving efficiency
to the verbal agreement. Again it is quite likely that with:
the element of assignment for the benefit of creditors added,
a compromise, as in this case, would be fraudulent in juris-
dictions where the right of a creditor is affected by the cir--
cumstance of his having security for the payment of his claim,
so that the retention of such security could be regarded, in
any sense, as an advantage obtained through the secret agree-
ment. Authorities are not wanting as to each of those propo-
sitions. The following are the most helpful of them which
have been brought to our attention or which we have been
able to discover. 6 Am. & Eng. Ency. of Law (2d ed.) 389,
390; *Robinson v. Striker,* 47 Hun, 546; *Van Brunt v. Van
Brunt,* 3 Edw. Ch. 14; *Nicolai v. Lyon,* 8 Oreg. 56; *Mat-
lack's Appeal,* 7 Watts & S. 79; *Bush v. Shipman,* 14 Sim.
239; *Cowper v. Green,* 7 M. & W. 633; *Duffy v. Orr,* 5 Bligh,
N. S. 620; *Ex parte Sadler,* 15 Ves. Jr. 52; *Kinsing's. As-
signee v. Bartholew,* 1 Dill. 155, 14 Fed. Cas. 642, No. 7,831.

The situation here is quite different from any discussed in
the citations if, as the trial court decided, there was no writ-
ten compromise agreement. Treating that as a verity for the
moment, we can see no ground whatever for denying appel-
lants' right to the collateral which it was agreed they should
have. The underlying principle of the doctrine as to a secret
agreement with one of several creditors, advantageous to that
one, joining in a compromise agreement, being fraudulent, is-
that such an agreement is pecuniarily preferential in that:

it secures to one creditor a valuable advantage from the compromise not common to all but to the common disadvantage aside from the favored one.   True, it has been said that if one creditor privately gains an advantage over other creditors as a consideration for his joining in a compromise agreement it is fraudulent even if the advantage is in the form of a bonus paid by a stranger.   Bishop, Insolvent Debtors (3d ed.) 608; *Knight v. Hunt*, 5 Bing. 432.   But here no advantage was obtained by the appellants in any way.   The agreement, which has been supposed to be wrongful, only provided that they should not lose anything by the compromise.   In the briefs of counsel for respondent and in the opinion of the trial court we find iterated and reiterated such terms as "preferential agreement," "gained an advantage," but there was no such thing which characterized the transaction.

We must next consider whether the trial court's decision, that the compromise agreement was not made in writing, is wrong.   Respondent's counsel contend that it is and that the written agreement cannot be varied by the previous oral one. Obviously, it is not necessary in order to make a written contract that the terms thereof shall be reduced to writing in a formal way on one paper and that it shall be signed by the parties in person.   A proposition in writing by or on behalf of one to another and accepted by or on behalf of the latter, each suggestion being on a separate piece of paper and not expressed in any formal way, yet so that the two show a meeting of minds upon some particular subject matter, and the parties assuming to act as agents in the matter, if there be such, being duly authorized thereto in writing or otherwise, make a good contract.   Here the committee authorized to represent the respondent and the owners of some ninety per cent. of the liabilities made a written proposition to all entitled to be represented in the assignment proceedings for a settlement of their claims.   Pursuant thereto respondent deposited

money therefor with a suggested mutual agent. Appellants on October 2, 1902, by a letter addressed to such agent, accepted in writing. That made a written agreement as completely as if what was expressed in the two papers had been reduced to writing on one and that signed by appellants and respondent. That is elementary. The trial court's decision in regard to the matter we cannot approve.

It is claimed on behalf of appellants that, conceding the compromise agreement to be in writing, it was competent to show that it was a mere part performance of an entire verbal contract and does not preclude showing the latter. That familiar rule does not apply where the verbal contract is inconsistent with or contradicts the written one, or where the writing plainly purports to contain the entire contract. *Hubbard v. Marshall,* 50 Wis. 322, 6 N. W. 497; *Braun v. Wisconsin R. Co.* 92 Wis. 245, 250, 66 N. W. 196; *Cuddy v. Foreman,* 107 Wis. 519, 526, 83 N. W. 1103. It will not be necessary to discuss such exceptions with reference to the facts of this case. Whether the first one mentioned applies depends upon what the written contract clearly means. If it does not include and is not inconsistent with the verbal agreement then the rule invoked by respondent's counsel does not apply, and there is no need of resorting to the one invoked by appellants' counsel.

The composition was made with reference to the status of the creditors in the assignment proceedings and the opportunity afforded respondent to judicially obtain his discharge from personal liability. That seems very plain by the idea expressed by the proposition and acceptance that the creditors purposed, by mutual agreement, to take the proposed percentage of their filed claims in lieu of their interests in the trust fund, and release respondent from personal liability as fully as the law might release him under the circumstances. The proposition referred to the report of the assignee, showing the assets and liabilities, and to the oppor-

tunity for a discharge of the debtor from personal liability, regardless of the attitude of his creditors, and stated that it was for the best interests of the latter to accept thirty-five per cent. of their claims and voluntarily discharge the former. They were admonished that in the event of any one of them declining the offer, the receiver, meaning the assignee, would pay each his percentage of the scheduled assets and the debtor could then obtain his discharge at the hands of the court. In that view and in the light of the legal right of appellants before indicated, which had been fully assented to by respondent, as shown by its omitting to schedule the collateral in the assignment proceedings, it seems very plain that neither of the parties considered the compromise agreement as any more advantageous to the debtor than an acceptance by appellants of their due share of the general assets at the hands of the assignee and a judicial discharge of respondent from personal liability, which, as we have seen, would not have prejudiced appellants' right to the collateral.

To construe the contract as if it were intended that appellants should surrender the collateral and their interest in the general assets in consideration of thirty-five per cent. upon the face of their claim would convict them of sacrificing about $1,000, for the purpose of taking part in the compromise agreement, while the ruling idea as to all was that each creditor could secure more by accepting the compromise than by not doing so. That is plainly shown by the wording of the proposition. Yet the claim is here made that appellants contracted to surrender the opportunity to obtain out of the general assets and the collateral upwards of $3,500 for the purpose of obtaining about $1,000 less. The result of so viewing the agreement would be so absurd that under a familiar rule one more reasonable should be sought for, and, if found within the fair scope of the language used by the parties, adopted. As has often been said, ambiguity calling for construction may as well appear from language clear in

itself but leading to some absurd result when applied literally
to the situation with which it deals, as by reason of uncer--
tainty of meaning upon its face. *Hoffman v. Maffioli,* 104.
Wis. 630, 641, 80 N. W. 1032. In either case the situation
of the parties at the time of entering into the contract, the
subject matter thereof, the circumstances leading up thereto,.
and all matters essential to enable the court to survey the
writing from the exact viewpoint of the parties at the time of
the transaction, may properly be considered in determining
just what they intended to express. *Boden v. Maher,* 105
Wis. 539, 543, 81 N. W. 661; *Johnson v. Pugh,* 110 Wis..
167, 170, 85 N. W. 641; *Excelsior W. Co. v. Messinger,.*
116 Wis. 549, 93 N. W. 459. In such circumstances the con--
tract may be read very differently from the literal sense
thereof, so long as its reasonable scope is not departed from
if necessary to give effect to what the minds of the parties
really met upon. That does not involve any modification of
the contract, "but has relation to the application of the lan--
guage used to the subject within the contemplation of the
parties as represented by the situation then existing and the
surrounding circumstances, which it may be assumed they
then had in view." *Zimmer v. Settle,* 124 N. Y. 37, 42, 26:
N. E. 341. Our judgment is that the written contract does
not include but is separate and distinct from the verbal agree--
ment.

There is another rule not often successfully invoked, which
seems to apply to this case. Where there is a distinct verbal
agreement which, under ordinary circumstances, could not.
be efficiently established in the face of a written one, it may
be, in an action between the parties as matter of defense
when one seeks to use the writing in a way to effect a dis-
honest or fraudulent purpose. *Braun v. Wisconsin R. Co.,.*
supra; *Juilliard v. Chaffee,* 92 N. Y. 529.

In the last case cited the plaintiff, a receiver in a trust for
creditors, sought to enforce against the defendant a written

instrument purporting to evidence an indebtedness on his part of $100. He was permitted to prove in defense circumstances which occurred prior to and contemporaneous with the making of the writing, showing that it was not intended to create or evidence an indebtedness as indicated by its language. Objection to the proof in that regard was made upon the ground that its admission would violate the rule as to varying a written contract by parol. The objection was overruled upon the ground, among others, that to exclude the proof, under the circumstances, would enable the plaintiff to use the writing in a way never contemplated by the parties thereto and to perpetrate a fraud.

Under the circumstances of this case it is very clear that when appellants accepted the offer of compromise neither they nor respondent supposed that it affected the former's right to the proceeds of the collateral which had already become their property. In that view the effort to use the compromise agreement as an instrument with which to take the value of the collateral away from appellants looks very much like an attempt wrongfully to convict appellants of having consciously given a thousand dollars or thereabouts for the purpose of joining in such agreement. The whole difficulty springs from viewing a perfectly legitimate transaction in respect to the agreement for the retention of the collateral by appellants, notwithstanding the compromise agreement, as wrongful.

What has been said renders it unnecessary to consider any other propositions discussed in the briefs of counsel. The judgment must be reversed, and the cause be remanded with directions to render a judgment in favor of defendants dismissing the plaintiff's complaint with costs.

*By the Court.*—So ordered.