In the

# United States Court of Appeals

## For the Seventh Circuit

No. 10-3177

DAKOTA, MINNESOTA & EASTERN
    RAILROAD CORPORATION,

*Plaintiff-Appellant,*

*v.*

WISCONSIN & SOUTHERN
    RAILROAD CORPORATION,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Western District of Wisconsin.
No. 3:09-cv-00516-wmc—**William M. Conley**, *Chief Judge*.

ARGUED JUNE 2, 2011—DECIDED SEPTEMBER 20, 2011

Before BAUER, POSNER, and MANION, *Circuit Judges*.

POSNER, *Circuit Judge*.  The plaintiff, DM&E for short, is a Class II Railroad (that is, a middle-sized freight-hauling railroad) that operates in a number of mid-western states. It owned rail lines in and near Janesville, Wisconsin, including a 200-foot spur line connecting one of its main lines with a plant owned by a company

named Freedom Plastics, Inc. that manufactured plastic pipe and other plastic products. The plant—the only shipper located on the spur—shipped several carloads of plastic products weekly over the spur, which was the only rail line that served the plant. These shipments made Freedom Plastics DM&E's largest Janesville customer.

Wisconsin & Southern, the defendant, another Class II Railroad, operates in Northern Illinois and Southern Wisconsin. It approached DM&E (actually a predecessor, but we can ignore that detail, and so we substitute "DM&E" wherever the predecessor's name appears in documents we quote) wanting to buy the Janesville rail lines, including the spur leading to the Freedom Plastics plant. DM&E, however, wanted to retain exclusive rights to serve its existing customers, mainly Freedom Plastics (but also Janesville Sand & Gravel, which however is not on the spur); and, as we'll see, the contract of sale so provides. The contract also allows DM&E to continue to run trains on the Janesville lines being sold to Wisconsin & Southern and grants DM&E an exclusive easement to use the spur to serve Freedom Plastics.

Several years after the sale, Freedom Plastics entered receivership. The receiver sold all its assets, including the plant served by the spur. The buyer of the plant, North American Pipe Corporation (NAPCO) (actually the buyer's parent, but that's another detail we can suppress), continues to manufacture plastic products in Freedom Plastics' former plant. Contending that the change in ownership had voided the exclusive easement, Wiscon-

sin & Southern contracted with NAPCO to ship products made in the plant over the spur, which is still the only rail line that serves the plant. NAPCO's contract of carriage with Wisconsin & Southern is not exclusive; DM&E continues to serve the plant, but at a diminished rate—Wisconsin & Southern runs trains to and from the plant seven days a week, DM&E only two.

DM&E brought this diversity suit to enjoin Wisconsin & Southern from using the spur and to obtain damages for the defendant's past use of it. DM&E contends that the reference in the contract to "Freedom Plastics" is to the plant, not to its owner. It further contends that Wisconsin & Southern is trespassing on its property, namely the tracks situated on the spur, by running railcars on it. DM&E sold the land under the tracks—that is, the right of way—to Wisconsin & Southern, but claims that it didn't sell the tracks that sit atop the land.

So DM&E has two claims, one for breach of contract and one for trespass. The district court entered summary judgment in favor of the defendant on both. Wisconsin law governs the substantive issues presented by the appeal.

A letter of intent that preceded the agreement of sale stated that DM&E would "retain trackage rights over all track to be sold" and retain "exclusive access to [its] existing customers (active or inactive inclusive of any relocation or expansions they might undergo)," but that "either Wisconsin & Southern or DM&E would have the right to develop and/or serve new customers on the line." But later DM&E submitted to Wisconsin & South-

ern a proposed agreement of sale which stated that the right of exclusive access retained by DM&E would extend "to each industry, shipper, receiver, or other facility . . . located on" the Janesville tracks it was selling.

Wisconsin & Southern returned the draft to DM&E with the words "each industry, shipper, receiver, or other facility" crossed out; and in another sentence in DM&E's draft—"Buyer shall not have the right to provide service to any Current Industry"—it crossed out the words "any Current Industry" and substituted "Freedom Plastics." An accompanying letter to DM&E explained that "we listed Freedom Plastics in an attempt to specifically list out your customers. Freedom Plastics is the only one that I am aware of that you serve on the line. If you have others, please list them out. By listing out the specific customer(s), we were merely trying to avoid any confusion or misunderstandings that may occur in the future."

DM&E responded with a new draft, which restored the language that Wisconsin & Southern had deleted and added, as illustrating "Current Industry," "Freedom Plastics," together with two companies (Janesville Sand & Gravel and General Motors) located on the rail lines (though not on the spur) that it was selling to Wisconsin & Southern.

Wisconsin & Southern responded to the revision by altering the proposed agreement of sale to state that DM&E's exclusive access would be to "its existing customers over the Rail Lines ('Current Industry')," implying that "Current Industry" means existing customers.

DM&E rejected this draft but eventually agreed, in the final contract of sale, that "DM&E . . . shall have exclusive access . . . to Freedom Plastics [and one other company—Janesville Sand & Gravel] ('Current Industry'), including any relocation or expansion that such Current Industry may undergo," but that both DM&E and Wisconsin & Southern could serve both any "existing industry" (presumably excluding any "Current Industry") and any "New Industry," defined as "any industry, shipper, receiver or facility other than Freedom Plastics [and Janesville Sand & Gravel and GM] . . . that constructs a new facility on a vacant site or occupies a previously vacant facility on the Rail Lines."

Also in the final contract of sale Wisconsin & Southern agreed to give DM&E an exclusive easement over the 200-foot spur to enable it to continue serving Freedom Plastics without competition. The deed (a quitclaim deed) that conveyed the property that DM&E was selling to Wisconsin & Southern stated that it was selling "the real property, estates, roadbeds, rights-of-way . . . fixtures, and appurtenances thereto; *together with* all improvements . . . specifically including . . . all rails, ties, ballast, switches . . . [and] spurs," except an easement over the spur "for the sole purpose of serving Freedom Plastics" (emphasis in original). A bill of sale separate from the deed had DM&E selling "all the personal property . . . located on the Rail Lines . . . including but not limited to all rail, other track materials, and all other Assets," apart from financial assets, rolling stock, and other equipment unrelated to the rails located on

No. 10-3177

the spur. The total sale price for the real and personal property was approximately $2.52 million.

With respect to the breach of contract claim, the district court ruled that the language of the contract was plain and there was no need to look further: NAPCO is not Freedom Plastics. Nor is it Freedom Plastics' successor in the corporate-law sense, as it would be had it acquired Freedom Plastics in a merger. *Columbia Propane, L.P. v. Wisconsin Gas Co.*, 661 N.W.2d 776, 784 (Wis. 2003); *United States Shoe Corp. v. Hackett,* 793 F.2d 161, 163-64 (7th Cir. 1986) (Wisconsin law). Freedom Plastics was sold in pieces, and the plant located on the spur was just one of those pieces and happened to be bought by NAPCO, which didn't assume any of Freedom Plastics' contracts.

DM&E argues that it wouldn't make any sense for "Freedom Plastics" to denote the company rather than the factory. A railroad can serve only customers located on tracks to which the railroad has access. If Freedom Plastics moved its factory, DM&E couldn't follow it to its new location unless that location happened to be on a rail line that DM&E owned or had trackage rights in. But if Freedom Plastics' former factory remained in operation albeit under new ownership, DM&E would be able to serve it and would want to do so—why would it care who owned the factory, as long as the factory continued to produce goods shipped by rail? Hence, DM&E argues, the convention in the railroad industry is that a customer's name actually denotes the facility that the customer (or, as in this case, after the sale of the factory to NAPCO, any new customer) owns.

DM&E is arguing that there is a "trade usage," a terminology special to a particular industry, in this case the railroad industry, which uses "customer" or "existing customer" in a way different from its use in ordinary discourse. But the only evidence it presented is that a railroad worker continues to refer to the factory as Freedom Plastics. That is no evidence at all. For all we know, the worker doesn't know the factory has a new owner. Recently the author of this opinion noticed in a newspaper article that the Willis Tower in Chicago had installed a glass-bottomed observation deck on the 103rd floor. He asked his wife in surprise, "I thought the Sears Tower was the only building in Chicago with more than a hundred stories." She answered in the pitying tone in which one answers dumb questions: "The name of the Sears Tower was changed to 'Willis Tower' two years ago."

We are not suggesting that evidence of trade usage must take the form of expert evidence; any management-level employee of a business engaged in a particular trade should be familiar with the meaning of the words used in that trade, and thus fit the definition of a lay witness entitled to give opinion evidence. Fed. R. Evid. 701; *Western Industries, Inc. v. Newcor Canada Ltd.*, 739 F.2d 1198, 1203 (7th Cir. 1984); see *Ty Inc. v. Softbelly's, Inc.*, 353 F.3d 528, 534 (7th Cir. 2003). But all DM&E offered to establish trade usage besides the railroad worker's affidavit was a statement by a lawyer for Wisconsin & Southern that he considered the term "industry" to be synonymous with "customer." But that is his client's position, not DM&E's: "Current Industry" means

an existing *customer*, such as Freedom Plastics, rather than a facility.

The district judge was content to base his decision on the literal meaning of "Freedom Plastics"—the name of a company, identifying the entity ("Current Industry") that DM&E had the exclusive right to serve. He was relying on the common-sense presumption that words in a contract are used in their usual sense unless evidence that they are not (which could be evidence of a trade usage at variance with ordinary meaning) is presented. *Maryland Arms Limited Partnership v. Connell*, 786 N.W.2d 15, 20-21 (Wis. 2010); *Gorton v. Hostak, Henzl & Bichler, S.C.*, 577 N.W.2d 617, 622-23 (Wis. 1998). But even without evidence that creates an ambiguity, literal meaning can be rejected when the result would offend common sense. *Maryland Arms Limited Partnership v. Connell*, *supra*, 786 N.W.2d at 21-22; *Corbett v. Joannes*, 104 N.W. 69, 75 (Wis. 1905); *Outlet Embroidery Co. v. Derwent Mills, Ltd.*, 172 N.E. 462, 463 (N.Y. 1930) (Cardozo, C.J.); *Beanstalk Group, Inc. v. AM General Corp.*, 283 F.3d 856, 859-60 (7th Cir. 2002); *Rhode Island Charities Trust v. Engelhard Corp.*, 267 F.3d 3, 7 (1st Cir. 2001).

Which might be thought the case here. DM&E wanted to keep serving Freedom Plastics' factory without competition from another railroad; why would it care if the owner changed? And Wisconsin & Southern was willing to allow DM&E exclusive access to the factory; was it really thinking that someday it could get access because of a change of ownership?

There may thus be enough doubt about what the parties actually meant by calling Freedom Plastics a "Current Industry" to justify resort to extrinsic evidence (that is, evidence other than the written contract itself). We summarized that evidence earlier; it consists primarily of the parties' exchange of preliminary contract drafts. The parol evidence rule does not permit such evidence to be used to contradict the terms of an unambiguous written contract, e.g., *Olympia Hotels Corp. v. Johnson Wax Development Corp.*, 908 F.2d 1363, 1373 (7th Cir. 1990) (Wisconsin law); *Fidelity & Deposit Co. of Maryland v. City of Sheboygan Falls*, 713 F.2d 1261, 1271-72 (7th Cir. 1983) (Wisconsin law), provided it was integrated; and the contract does contain an integration clause and is unambiguous once the issue of trade usage is set to one side. But both parties have preferred to rely on the evidence of the preliminary negotiations rather than to invoke the parol evidence rule to exclude it.

The evidence doesn't help DM&E. When Wisconsin & Southern struck out, as being confusing, the term that DM&E had inserted—"each industry, shipper, receiver, or other facility" on the Janesville lines that DM&E was selling (including therefore the spur)—this should have cued DM&E to propose to dispel the confusion by substituting for the deleted words "the facility now owned by Freedom Plastics." Its failure to do so would indicate to Wisconsin & Southern that DM&E cared about the specific customer, that is, Freedom Plastics, and not about the plant owned by Freedom Plastics should ownership of the plant change. For all Wisconsin & Southern knew, DM&E might

have had some highly advantageous deal with Freedom Plastics that made it want to retain exclusive access to that company—for if the deal was indeed highly advantageous to DM&E, Freedom Plastics would have an incentive to negotiate with another railroad for carriage at a lower price if another railroad had access to its plant, as it would were it not for DM&E's retention of exclusive rights to serve Freedom Plastics. So far as Wisconsin & Southern could know, DM&E really did intend just to retain exclusive access to the customer, and not to the facility.

DM&E argues that if the change in contract language over the course of the negotiations had deprived it of exclusive access to the plant, the parties would have renegotiated the price, since DM&E would be getting less than it expected. Inferring the meaning of a contract from the contract price is a legitimate tool of interpretation. *In re Kazmierczak*, 24 F.3d 1020, 1022 (7th Cir. 1994) (Wisconsin law); *Sutter Ins. Co. v. Applied Systems, Inc.*, 393 F.3d 722, 725-26 (7th Cir. 2004); cf. *S.A. Healy Co. v. Milwaukee Metropolitan Sewerage District*, 50 F.3d 476, 479 (7th Cir. 1995) (Wisconsin law); *AL Tech Specialty Steel Corp. v. Allegheny Int'l Credit Corp.*, 104 F.3d 601, 606 (3d Cir. 1997). But the failure to change the price supports Wisconsin & Southern rather than DM&E. It suggests that the change in language was indeed, as Wisconsin & Southern argued in the letter we quoted, a clarification rather than a substantive change.

In referring to extrinsic evidence to resolve a contract dispute, we may seem to be invading the jurisdiction of

the trier of fact. When the only evidence in a contract case is a written contract, its interpretation is deemed an issue for the judge to decide; but when there is other evidence, even evidence consisting solely of documents of unquestioned validity, the meaning of the contract becomes a jury issue. *Cook, Inc. v. Boston Scientific Corp.*, 333 F.3d 737, 742 (7th Cir. 2003); *Western Industries, Inc. v. Newcor Canada Ltd.*, *supra*, 739 F.2d at 1205; *Myers v. Selznick Co.*, 373 F.2d 218, 222-23 (2d Cir. 1966) (Friendly, J.) That rule may be due for reexamination. There are reasons for wanting to keep contract disputes away from juries wherever possible, because most jurors have no experience with contracts, or at least commercial ones. And if a judge is trusted to infer meaning from one document, why not from a series of documents? But we'll not try to explore that question, because there has been no objection to judicial consideration of the extrinsic evidence, all of it documentary and of unquestioned authenticity.

So DM&E loses on its contract claim, and we move on to its trespass claim. There are several preliminary puzzles. Why would DM&E sell the land underneath the tracks, especially underneath the spur leading to the Freedom Plastics factory, but retain ownership of the tracks? DM&E was not about to go onto the right of way on which they sit and pull them up, with the consequence that Wisconsin & Southern could not use the spur until it had replaced them. And what if Wisconsin & Southern had replaced some of the tracks and repaired or strengthened others, as it claims to have done? Dividing ownership of the land and the tracks is

so weird that there would have to be compelling evidence, textual or otherwise, to justify the interpretation urged by DM&E.

The contract of sale provides that the personal property being sold, including the tracks, excludes "spur trackage used solely to serve Freedom Plastics." This exclusion doesn't appear in the quitclaim deed that conveyed personal property to Wisconsin & Southern. In fact the deed is explicit that the rails go with the land underneath them in the sale. The deed merely reserves to DM&E an easement in the right of way, that is, reserves a right to use the 200-foot spur to serve Freedom Plastics. We have just held that the easement expired when Freedom Plastics decamped. But even if DM&E were correct that the easement would expire only when Freedom Plastics' plant ceased operating, what sense would it make for DM&E to own the track after its easement expired, whenever it expired?

When a contract of sale precedes a deed, and there is an inconsistency, the deed governs. *Miles v. Mackle Bros., Division Deltona Corp.*, 242 N.W.2d 247, 249-50 (Wis. 1976) (This rule is called, unhelpfully, "merger.") For it's the deed that is going to be recorded and provide notice to subsequent purchasers or lienors. DM&E argues that the rule is inapplicable to personal property mentioned in the contract of sale, and often this is true. If you make a contract to sell your house and your car to the same person, the deed for the house will not mention the car because mention of it would provide no relevant information to someone searching the title records of

the real property. So the omission will not invalidate the sale of the car. *Miles v. Mackle Bros., Division Deltona Corp., supra*, 242 N.W.2d at 250; *Ferro v. Miller*, 246 N.Y.S.2d 149, 151-52 (N.Y. App. Div. 1963). "If delivery of the deed is intended only as part performance, the doctrine of merger does not apply." 11 *Thompson on Real Property* § 96.11(e), p. 651 (David A. Thomas ed. 2002).

But the rails on a railroad's right of way are fixtures, see *Premonstratensian Fathers v. Badger Mutual Ins. Co.*, 175 N.W.2d 237, 239-40 (Wis. 1970); *Wiggins Ferry Co. v. Ohio & Mississippi Ry.*, 142 U.S. 396, 415-16 (1892); *Union Pacific R.R. v. Board of Commissioners of Jefferson County*, 217 P. 315, 317 (Kan. 1923), and fixtures are part of the real property to which they are attached. Anyone contemplating the purchase of the right of way would therefore justifiably assume in the absence of a contrary statement in the deed that the rails were being sold along with the right of way conveyed by the deed. See *Burlington Northern R.R. v. Scheid*, 398 N.W.2d 114, 118 (N. Dak. 1986). He would have no reason to go looking for an anterior sale agreement with variant terms.

Even the purpose of the trespass claim is obscure. DM&E argues that Wisconsin & Southern's use of the spur could damage the rails, and for all we know that's true, but Wisconsin & Southern ripostes that it has improved the trackage in various ways, including by replacing some of the rails. It presented evidence to this effect in the district court, which DM&E did not counter, thus leaving the case barren of evidence of a net detrimental effect to the rails caused by Wisconsin & Southern's use of the spur.

Moreover, the principal damages that DM&E seeks for the alleged trespass are of course the profits that the alleged trespass is enabling Wisconsin & Southern to divert to itself from DM&E. And this claim falls with the contract claim; for without prevailing on the latter, DM&E cannot establish that it has a legally protected interest in exclusive access to the NAPCO plant.

DM&E also argues that it can maintain a trespass suit without proof of damages. That would be true if the suit charged trespass to real property, because such a suit is a common device for determining property rights, and specifically for preventing the alleged trespasser from obtaining the plaintiff's property by adverse posses-sion. Wis. Stat. § 893.28; *Jacque v. Steenberg Homes, Inc.*, 563 N.W.2d 154, 159 (Wis. 1997); *Restatement (Second) of Torts* § 163 and comment d (1965); *Martin v. Amerman*, 133 S.W.3d 262, 267 (Tex. 2004). But a suit for trespass to personal property is not a title-proving device, so, as with other torts, damage must be proved. *Wisconsin Telephone Co. v. Reynolds*, 87 N.W.2d 285, 287-88 (Wis. 1958); *Van Alstyne v. Electronic Scriptorium, Ltd.*, 560 F.3d 199, 208 (4th Cir. 2009); *Restatement, supra,* § 218.

The trespass claim is, in short, a red herring. If the contract gave DM&E exclusive access to the plant that Freedom Plastics owned when the contract was signed, DM&E is entitled to the relief it seeks without regard to any trespass. If the contract did not grant DM&E such access, then Wisconsin & Southern's use of the spur to serve the current owner of the plant is authorized and so can't be a trespass.

The judgment for the defendant is

AFFIRMED.