**BIGELOW–LIPTAK CORPORATION, a Michigan Corporation, Plaintiff,**

v.

**The CONTINENTAL INSURANCE COMPANY, a New York Corporation, Defendant.**

**Civ. No. 36876.**

United States District Court, E. D. Michigan, S. D.

July 30, 1976.

Bruce D. Carey, Detroit, Mich., for plaintiff.

David J. Lanctot, Detroit, Mich., for defendant.

## MEMORANDUM OPINION

GUY, District Judge.

This litigation involves the construction of exclusionary language contained in a policy of insurance issued by defendant (hereinafter referred to as Continental) to the plaintiff, Bigelow-Liptak Corporation (here-

inafter referred to as Bigelow). This was a bench trial in which the issues were submitted to the court primarily on the basis of seven depositions which were a part of the court file. The testimony presented at trial was very limited and was basically duplicative of that contained in the depositions with the exception of testimony presented on the issue of damages sustained by the plaintiff in connection with the settlement of the claims against him.[1]

Bigelow is in the refractory construction business (B–3). They work with refractory installation and repair in connection with kilns, boilers and other types of industrial heat enclosures. Continental is a general insurance carrier who in this case issued to Bigelow a policy of comprehensive general liability insurance (Exhibit 2). The incidents which give rise to this litigation concern two separate and distinct contracts entered into by Bigelow for refractory work. The first was as a subcontractor for the Nooter Corporation for work to be performed on property owned by the Humble Oil Company in Linden, New Jersey. The second contract involves refractory work to be done for Charmin Paper Products Company in Pennsylvania. It is, thus, necessary to set forth the facts concerning the two contracts separately.

Humble Oil Company awarded a general contract to the Ralph M. Parsons Company for the construction of a refinery facility. The general contract required the construction of five spherical reactors, or pressure vessels, as part of the refinery facility. Parsons awarded a subcontract to the Nooter Corporation for the construction of the five pressure vessels. Due to the size and weight of these vessels, they were made by Nooter in subassemblies at its plant in St. Louis, Missouri, and shipped disassembled for construction on the New Jersey site. The subcontract between Parsons and Nooter called for each of these pressure vessels to be lined with refractory material four

and one-half (4½″) inches in thickness. Rather than do this work themselves, Nooter subcontracted the refractory work to Bigelow.

When the pressure vessels were assembled, they were bolted down with anchor bolts through a concrete structure approximately 25 feet wide, 150 feet long, and 20 feet above grade (A–10). The full operating weight of an individual pressure vessel was 392,300 pounds (C–49). The concrete foundation to which the pressure vessels were attached was in turn firmly affixed to the real estate owned by the Humble Oil Company.

When Nooter completed the assembling of the first of the pressure vessels, it informed Bigelow that its workmen could then enter the vessel and begin to apply the refractory material which, in this instance, was gunnite, a type of liquid concrete which is sprayed under pressure onto a surface and then hardens. The installation of the refractory lining in the first pressure vessel was uneventful. However, when the work was completed, inspectors from Humble Oil and Parsons discovered that in some places the gunnite did not measure the four and one-half inches in thickness that was required by the contract specifications (A–14). Inspectors and other personnel from Humble, Parsons and Nooter were present both in and outside the pressure vessel at various times during which Bigelow was performing its work. Upon learning of the variance from contract specifications, Nooter ordered Bigelow to remove that portion of the lining which was not of the required thickness and to reinstall refractory lining of a correct thickness.

The only way to remove the refractory material at this time was through the use of air hammers and chisels (C–8 and C–48). In the course of removing the refractory material, the outside shell of the pressure vessel was damaged, such damage consist-

---

1. Although there were seven depositions, they are contained in three bound volumes. Since these depositions were used extensively in the finding of the facts in this matter, they will be cited in this Opinion as follows: Deposition of Andrew J. Tonas (A– ); depositions of Thomas Maczko, John Hribovski and William Humphreys (B– ); depositions of Thomas Mooney, George J. Moffitt and John J. Balabon (C– ).

ing of gouging and scarring, in some instances the gouges being up to one-quarter of an inch deep (A–19).

Upon examination of the damage, it was the consensus of Humble, Parsons and Nooter (A–19) that the scars and gouges would have to be repaired or else there could conceivably be a later failure of the vessel. The repair work consisted of cleaning up the area of the gouge, grinding and brushing the shell, building up the deeper gouges with welded metal, and ultimately putting the entire vessel to a hydrostatic test before Bigelow could be allowed to replace the lining (A–20). Since Bigelow did not do this type of work, the actual repair work was done by Nooter. Nooter subsequently presented a bill to Bigelow for this work in the amount of $35,158.69. Bigelow presented this billl in the form of a claim to Continental who declined coverage claiming the benefit of policy exclusions which will be discussed infra. Bigelow ultimately compromised the claim with Nooter for $31,698.72, which amount Bigelow has paid.

There is no dispute that the site in question was completely controlled from a physical standpoint by Humble Oil. The site was fenced, there were security guards on duty at all times, and entry was completely controlled. Persons entering the job site would enter through a main gate and would have to sign up and be given a badge or car pass. In general, workmen were brought to the site by car or bus, and the Bigelow crew was transported to the job site by one of the Bigelow supervisors (C–37).

The facts surrounding the Charmin claim are similar in many respects. Bigelow had been hired by Charmin to take off the old refractory and install new refractory in a large boiler that was used by Charmin to burn up the excessive alcohol which was a by-product from the wood that they processed at their plant (B–4). The boiler in question was housed on the second floor of the Charmin plant (B–5), and was approximately ten feet by twenty feet, and twenty feet in height (B–90). The boiler was part of the superstructure of the building. It was completely attached to the building. There was a common series of beams that held the boiler and the floor (B–107). Bigelow was to perform two functions within the boiler. First, they were to build a new brick front firewall, and secondly, they were to cover the "tubewall" with a type of plastic coated refractory material (B–90–91). In connection with putting the new refractory material on the tubewall, it was necessary to first take the old refractory material off. The removal of the old refractory material from the tubes was accomplished by the use of an air pressure operated blunt chisel (B–8). The tools used in connection with the removal of this refractory material were similar to tools used on other jobs of this nature (B–8). Employees of the Charmin Paper Company at all times exercised over-all supervision over the work as it progressed, and daily meetings were held in order to discuss the progress made that day and what was contemplated for the next day (B–12).

During the course of the work, and as a result of one of the regular inspections made of the work by the Charmin personnel, it was discovered that some of the boiler tubes had been "scratched" in connection with the removal of the refractory material (B–13). The discovery of the apparent damage to the tubes occasioned further investigation and testing by Charmin employees who ultimately circled those indentations or gouges which were going to have to be repaired (B–15). Since Bigelow did not have the expertise necessary to do the repair work, the repair work was done on behalf of Charmin by others, and the cost of such repair work, in the amount of $2,603.01, was deducted by Charmin from amounts owing on the contract to Bigelow. Employees of Bigelow who inspected the damage and repair work were of the opinion that the charge made for the repair work was very reasonable. The branch construction manager for Bigelow, William Humphreys, stated in his deposition that, "I thought it was going to be twice that."

Bigelow again presented a claim for payment to Continental in the amount of

$2,603.01, which claim was denied by Continental due to policy exclusions.

As was the case at the New Jersey site, there is no dispute as to the fact that the Charmin premises, in general, were entirely controlled by Charmin personnel. The plant site was fenced, and in order to get in, one had to go through guards and had to be expected by the guards in order to gain entry (B–5). Due to the security involved, Bigelow employees were brought in and taken out of work daily by a Bigelow supervisor.

One additional relevant point concerns the lighting inside the boiler. The lighting was deemed by employees of Bigelow to be very poor (B–7). The lighting was dictated by Charmin who would not allow any lighting inside the boiler other than "five volt lighting." At one point, employees of Bigelow "bootlegged" their own light into the boiler, but the Charmin people came in and took it out because it was against their policy to have this type of lighting inside the boiler (B–63).

### The Insurance Policy and Exclusions

After the denial of the claims by Continental, Bigelow ultimately instituted this lawsuit. In its answer to Bigelow's complaint, defendant Continental relied upon three exclusions in the policy of insurance which it claims relieves them from any liability in this matter. These provisions are as follows:

> " 'Occurrence' means an accident, including injurious exposure to conditions, which results, during the policy period, in bodily injury or property damage neither expected nor intended from the standpoint of the insured."

> "This insurance does not apply:

> . . . . .

> "(i) to property damage to (1) property owned or occupied by or rented to the insured, (2) property used by the insured, or (3) *property in the care, custody or control of the insured, or as to which the insured is for any purpose exercising physical control.* (Emphasis added)

> "(n) to damages claimed for the withdrawal, inspection, repair, replacement, or loss of use of the named insured's products, or work completed by or for the named insured, or of any property of which such products or work form a part, if such products, work or property are withdrawn from the market or from use because of any known or suspected defect or deficiency therein."

■ Defendant thus claims that they are not liable to Bigelow in this matter since the claim arose from a set of circumstances that was (1) not an "occurrence" as defined by the policy, (2) was damage to property in the "care, custody, or control" of the insured and thus excluded, or (3) damages claimed for the repair of insured's work which was withdrawn from use because of a known or suspected defect or deficiency. If, in fact, this court finds that Continental is correct in any one of these three contentions, Bigelow must be denied the relief it seeks. Therefore, this court must examine each of defendant's three contentions. In examining these contentions, it is clear that this being a diversity of citizenship contract action, that the court must apply the law of the state in which the contract was made. The parties and the court are in agreement in this matter that the law of the State of Michigan should be applied. It is far easier to state this general proposition as to defendant's three contentions that it is to apply the Michigan law, however. As to defendant's contention relative to "occurrence," this court will spend as little time with this contention as the defendant did itself. During the trial of the matter, there was no argument whatsoever from the defendant on the question of "occurrence." Further, in its trial brief filed the date of the trial, Continental cites no cases in support of its position, and simply makes the flat statement that:

> "It is difficult to understand how Bigelow could accidentally put many scratches and dents in the steel wall at the Humble site while removing the refractory material."

The facts as found by the court in outline, supra, clearly indicate that the damage done to the steel shell of the pressure vessel at the Humble site and the damage done to the boiler tubes at the Charmin site were clearly the result of an "accident," and as such, are clearly within the definition of the policy term "occurrence." It is clear under Michigan law, as indeed it is clear under the law of all jurisdictions, that if the terms used in an insurance policy are clear and unambiguous that they should be taken and understood in their plain, ordinary and popular sense. *Sump v. St. Paul Insurance Company,* 21 Mich.App. 160, 163, 175 N.W.2d 44.

Defendant's second and third contentions relative to policy exclusions lend themselves less easily to ready disposition, however. Since the court feels that the law is much clearer as to the so-called (n) exclusion, it will dispose of this contention first. To begin with, it is to be noted that neither party has called the court's attention to a Michigan case directly dealing with an exclusion worded in this manner, nor has the court been able to find a Michigan case on this subject by its own research. Additionally, it should be noted that in its trial brief, defendant did not even submit argument relative to this exclusionary clause, although in fairness to the defendant, it should be pointed out that it did incorporate by reference its brief in support of its prior motion for summary judgment. In that brief, however, no cases whatsoever are cited, and the defendant makes an argument based solely upon the language of the (n) exclusion as related to the facts in the case.

The first problem with clause (n) is it is extremely difficult to read since it purports to cover so many factual situations. The court believes that by deleting those portions of the clause that are inapplicable to the facts of this case, that the clause should be read as follows:

"To damages claimed for the . . . repair . . . of . . . the named insured's . . . work . . . or of any property of which such . . . work form a part, if such . . . work, . . . are withdrawn from . . . use because of any known or suspected defect or deficiency therein."

The court finds the above exclusion to be inapplicable for the following reasons. First, the facts clearly indicate that with regard to the pressure vessel owned by Humble Oil and the boiler owned by Charmin that neither one were in use at the time the work was being performed by Bigelow. There is no testimony to indicate that the time necessitated for the repairs occasioned by the work performed by Bigelow caused any additional down time of the equipment involved whatsoever. In any event, neither owner of the property being worked on made any claim as a result of down time or as a result of the pressure vessel or boiler being withdrawn from use. Accordingly, we are not dealing in this case with any damages occasioned from the inability to use an article because of the damage caused by Bigelow, but are solely talking about repair costs. Although section (n) does make reference to the word "repair," it must be read in context with the balance of the section dealing with withdrawal from use.

Furthermore, although there are apparently no Michigan cases on point, there are cases dealing with the exact language contained in exclusion (n). Exclusion (n) is a common provision in comprehensive liability insurance policies, and is known as the "sistership exclusion," this term being derived from an incident in the aircraft industry in which one plane crashed and its "sisterships" were thereafter grounded and recalled by the manufacturer in order to correct the common defect which had caused the crash. *Arcos Corporation v. American Mutual Liability Ins. Co.,* 350 F.Supp. 380 (E.D.Pa.1972). The *Arcos* case also dealt specifically with provision (n) in the exact same language as is contained in the policy in dispute in this litigation. Interestingly enough, in *Arcos* there was a claim for damages incurred as a result of having to "reinspect, rip-out, replace and repair various welds." In indicating that exclusion (n)

had no application, the court in *Arcos* stated:

"Exclusion (n) has no application to Arcos' claim. That provision applies only if the product or property of which it is a part is 'withdrawn from the market or from use' by the insured, and even in such situations, the policy still covers damages caused by the product that failed. Arcos did not recall or withdraw any product claimed to be defective by a buyer, and its claim for damages does not include any expenses for such action." *Id.* at 385.

The facts of *Arcos* are directly analogous to the facts and claims of the case at bar, and accordingly, are direct authority for the proposition that exclusion (n) has no application to a fact situation such as presented by this litigation.

The court is now left with the third and only remaining contention of the defendant relative to the "care, custody and control" exclusion. There is no doubt that this is the exclusion to which the parties to this litigation directed their primary attention, and undoubtedly the one on which defendant bases its primary claim for a decision in its favor.

Here again, although it is clear that Michigan law should be applied, there is a difficulty. In this case, the difficulty is not a lack of decisional authority for, indeed, four Michigan cases have dealt precisely with the exact language contained in the "care, custody and control" exclusion at issue in this litigation. The problem arises from the fact that the four decisions are from the Michigan Court of Appeals with the Supreme Court never having ruled on this subject. Furthermore, in three of the four cases, the only action taken by the Court of Appeals was to remand for further proceedings generally indicating that in the resolution of cases involving the "care, custody and control" clause, the facts play a major part. Notwithstanding these facts, the Michigan appeals decisions are of some value, however, because they do indicate a clear philosophy insofar as the Michigan Court of Appeals is concerned relative to this clause, and further, they do in fact consider almost all the cases from other jurisdictions that have dealt with this clause. Therefore, this court, in making its decision, will place considerable weight upon the decisions of the Michigan Court of Appeals that construe the "care, custody and control" clause.

The first Michigan case dealing with the interpretation of this clause is *Anderson v. Brown,* 21 Mich.App. 699, 176 N.W.2d 457 (1970). In this case, the plaintiff was a contractor who had been hired to do the carpentry work on a home that was being built. When the work was about 75 percent completed, the home was destroyed by fire. Defendant insurance company denied coverage on the basis of the "care, custody and control" clause. At the trial of this matter which was before a jury, at the conclusions of the proofs, the trial court granted the insurance company's motion for a directed verdict ruling that the language of the policy was clear and unambiguous and excluded coverage. The Michigan Court of Appeals reversed and remanded holding that the language in question was not completely unambiguous as the trial court had indicated, and that a jury could have reasonably concluded that the house was not in the "care, custody or control" of the contractor. Although the case discusses what some of the other cases and text writers have held relative to the "care, custody and control" clause, it is not particularly helpful in the resolution of the case at bar, since the primary purpose of the discussion in *Anderson* is to show that there is a considerable difference of opinion among various courts insofar as the interpretation of this clause is concerned. The primary value of the case in connection with the resolution of this litigation is that it is the first indication that the Michigan courts will not follow the "clear and unambiguous" rulings of some courts relative to the "care, custody and control" clause. The case also has some value in that, although the facts reported are sketchy, one of the factors that influenced the decision of the Michigan Court of Appeals was the fact that other subcontractors were on the premises during part of

the time that plaintiff was working on the property.

Two years later, the Michigan Court of Appeals decided *Appicelli Sales v. Citizens Mutual,* 40 Mich.App. 287, 199 N.W.2d 242 (1972). Appicelli had been hired to unload a mechanical cherry picker from a flatbed trailer. In order to accomplish the unloading, Appicelli used a wrecker on which had been mounted a nineteen-ton winch operating a boom. Employees of Appicelli as well as employees of the company that owned the cherry picker were involved in the operation. An employee of Appicelli was in actual physical control of the equipment that was to do the lifting. In the course of the lifting operation, the cherry picker fell to the ground and was damaged. The defendant insurance company failed to extend coverage on the basis of the "care, custody and control" clause. The Court of Appeals, without the discussion of any other cases whatsoever, decided the opinion in the following language:

"After examination of the record we can only conclude that this case falls within the exclusion." Id. at 289, 199 N.W.2d at 243.

There was a dissent in *Appicelli* in which the dissenting judge indicated that the presence of the employees of the owner of the cherry picker and their general supervision of the operation indicated that Appicelli did not in fact have "care, custody and control," and that the exclusionary clause should not have applied.

In 1974, the Court of Appeals decided the last two of the four Michigan cases, and apparently recognizing that this issue was one that was going to be litigated with some frequency, wrote opinions which were much more detailed and which contained an analysis of the relevant authority on this question. The first of these 1974 cases is *Arrigo's Service Inc. v. Aetna Life and Casualty Company,* 54 Mich.App. 482, 221 N.W.2d 206. In *Arrigo,* the plaintiff was in the business of repairing cargo trailers. A trailer owned by North American Van Lines was brought to plaintiff's place of business for repair. The repairs to be made

were external and the trailer itself was locked and the keys in the possession of the driver. One of Arrigo's employees began welding and, subsequently, smoke was discovered coming from the trailer. Since the trailer was locked, a cutting torch was used to get inside the trailer. The fire that resulted from the work activities of plaintiff's employees damaged the contents of the trailer. The owner of the trailer sued Arrigo for damages and Arrigo sought to have its insurance company defend the action; however, the insurance carrier refused claiming the benefit of the "care, custody and control" clause. At the trial, Arrigo conceded that he had care, custody and control of the trailer, but maintained that he had no care, custody or control of the contents. Although it was a jury trial, the trial court granted a directed verdict for the defendant insurance company on the basis of the exclusion. The Michigan Court of Appeals reversed and remanded, and in the course of its opinion discusses many of the cases which the parties to this litigation have relied upon.

In the course of its decision, the Michigan Court of Appeals puts its stamp of approval upon the following propositions:

"It is axiomatic that the purpose of insurance is to insure." *Goswick v. Employers' Casualty Company,* 440 S.W.2d 287, 289 (Tex., 1969).

". . . if an insurance policy calls for construction, it is to be construed liberally in favor of the insured and strictly against the insurer." *Francis v. Sheper,* 326 Mich. 441, 448, 40 N.W.2d 214, 217, and a host of other cases.

"Exclusionary clauses in insurance policies are to be strictly construed against the insurer." *Weaver v. Michigan Mutual Liability Company,* 32 Mich.App. 605, 609, 189 N.W.2d 116, 118 (1971).

The court then goes on to discuss specifically the "care, custody and control" clause. There is little doubt that the Michigan Court of Appeals has strong feelings relative to the language used. In footnote 7, at page 488 of the decision at page 210 of 221 N.W.2d, the court indicates that if so many

courts had not impliedly assumed the validity of the clause that they would be "inclined to find this clause void on the basis of public policy." The court further states in the same footnote that the burden should be on insurance agents and insurance companies to give specific examples to their insureds of the import of the clause. With that predicate, it is not surprising that the court then goes on to rule that the clause is ambiguous. In an effort to set out guidelines for the disposition of future cases, the court incorporates the following taken from an A.L.R. annotation:

"(1) Where the *property damaged is merely incidental* to the property upon which the work is being performed by the insured, the damaged property is not considered as in the possessory control of the insured, and a clause excluding from liability damage to property 'in care, custody, or control of the insured' will not operate to exclude the insurer from liability under the policy.

"(2) Where, however, the *property damaged is under the immediate supervision of the insured and is a necessary element of the work involved*, the damaged property is considered as in the possessory control of the insured, and the exclusionary clause will effectively operate to exclude the insurer from liability under the policy.

"(3) A third principle seems a permissible conclusion from the two other rules: Where the property damaged is in the proprietary control of the insured, whether a necessary element of the work involved or merely incidental thereto, the exclusionary clause will operate to exclude the insurer from liability under the policy." (Footnotes omitted.) (Emphasis supplied.) 62 A.L.R.2d 1242, 1247–1248.

Applying the above criteria to the facts, the court concludes that the contents of the van were merely incidental to the work the plaintiff was performing and, thus, were not within his "care, custody and control." On this basis, the trial court decision for the defendant insurance carrier was reversed and remanded.

The last and lengthiest of the Michigan decisions is *Northwestern National Insurance Company v. Pennington Brothers, Inc.*, 55 Mich.App. 66, 222 N.W. 36 (1974). Prairie Tank and Construction Company had a contract to dismantle, remove and reconstruct a large oil storage tank. In order to accomplish this task, it was necessary to remove the product from the tank, and Pennington Brothers was hired for this job. In order to remove the crude oil that was stored in the tank, Pennington Brothers determined that it would be necessary to cut a section out of the tank. While making this cut, the torch that was being used ignited the contents and a fire resulted which damaged the tank. Prairie Tank and Construction Company sued Pennington Brothers, and the insurance carrier for Pennington Brothers sought a declaratory judgment as to whether they would have to defend the suit brought against Pennington. The basis for their claim that they did not have to defend was the "care, custody and control" exclusion contained in the policy. The trial court ruled that, at the time of the fire, Pennington Brothers did have care, custody and control of the tank, and, thus, the exclusionary clause applied. The Michigan Court of Appeals reversed. In so doing, the court made the following findings:

"(1) The applicability of this exclusionary clause is a question of fact, not law.

"(2) The clause is inherently ambiguous and thus to be strictly construed against the insurer.[2]

"(3) The most valuable indicium of applicability is whether the property damaged was necessary to the insured's work as opposed to incidental thereto.

"(4) Physical control connotes some degree of responsibility."

---

2. The Michigan Court of Appeals has thus progressed from its finding in *Anderson v. Brown*, 21 Mich.App. 699, 176 N.W.2d 457 ("that this clause cannot be held as a matter of law to be "clear and unambiguous") through *Arrigo's*

*Fleet Service v. Aetna*, 54 Mich.App. 482, 221 N.W.2d 206 (where they held the clause to be ambiguous) to the present case where they now hold the clause to be "inherently ambiguous."

Thus far, the opinion is largely a review of *Arrigo*. However, at this point the court interjects a new concept. The court remands the case to the trial court, "to determine whether the tank was so affixed to the real estate as to have become part of it, or whether the tank was movable." In support of its consideration of this element, the court reviews several of the leading cases purporting to deal with this exclusionary clause in instances involving real estate or property more or less permanently affixed to the real estate. Unfortunately, some of the cases reviewed are susceptible of an interpretation other than that for which they are principally cited. For example, *Goswick v. Employers' Casualty Company*, 440 S.W.2d 287, 290 (Tex.1969), is cited for the proposition that "only rarely has the exclusion been applied to realty." What actually happened in *Goswick*, however, was that the court found some of the damaged property within the exclusionary clause and others to be outside the clause. It would appear that the test applied in *Goswick* was that that property which was damaged which was "necessary to the insured's work," was held to be within the exclusionary clause and the remainder of the property damage was held to be outside the clause. Similarly, in *Maryland Casualty Company v. Hopper*, 237 S.W.2d 411 (Tex. Civ.App.1950), the court does use language which indicates that the fact that part of the damaged property was "so firmly affixed to the realty as to become a part of it" played a part in their decision. The decision in the case is equally explainable, however, by applying the rationale suggested as important by the Michigan court in *Pennington* to the effect that the damaged property ruled outside the purview of the exclusionary clause was merely incidental to the work being performed by the insured.[3]

There is no other explanation, however, for *Klapper v. Hanover Insurance Company*, 39 Misc.2d 215, 240 N.Y.S.2d 284 (1963). In this case the insured had a contract to clean windows. In the course of cleaning the windows, he damaged the windows. Certainly the property damaged in terms of the criterion deemed important by the Michigan court as well as many others was "necessary" to the insured's work. The New York court, however, holds that the exclusionary clause did *not* apply in this situation, stating that the insured only had a right of access to the property and that "possession or control of *real property* is indicated by an occupation exclusive of the control of anyone else." (Emphasis supplied.)

Similarly, in *Gibson v. Glens Falls Insurance Company*, 241 S.C. 293, 128 S.E.2d 157 (1962), the court held that the exclusionary clause did not apply to damage of the floor of a swimming pool which the insured had contracted to clean. Again, it appears clear that the property damaged was "necessary" to the work being performed. The court holds, however, that all the insured had was the right of access to the property emphasizing that the pool was located on the property of the owner close to his residence.

In *Leiter Electric Company v. Bituminous Casualty Corporation*, 99 Ill.App.2d 386, 241 N.E.2d 325 (1968), the plaintiff was a machinery installer, and as part of the contract in the case in question, he was to ground the electrical system of the machinery installed to an underground water pipe being laid subsurface by a different contractor. The copper wire used as a ground was to be attached by a brazed connection, and in the course of this operation, the pipe cracked where each connection was made. In holding the exclusionary clause inapplicable, the court does indicate that it is not ruling that such clauses are applicable only to chattel property. It goes on to say, however:

---

**3.** In the *Maryland Casualty Company v. Hopper* decision, supra, the court appears to use the words "necessary" and "incidental" as meaning the same. This is not consistent with the great bulk of cases including those from Michigan which draw an important distinction

between property that is "necessary" to the work of the insured as opposed to "incidental" to it. This court would read the *Maryland Casualty* decision as supportive of the general rule nonetheless.

". . . it does reveal that our concepts of possession of chattel property and hence care, custody or control thereof are not readily applicable where the property damage is in the nature of real property. This is particularly true where the property damaged is more or less firmly and permanently attached to the real estate." 241 N.E.2d 325, 327–328.

Although the contractor was directly working on the property that was damaged and the property was damaged as a direct result of the work he was performing, the court nonetheless holds that the contractor only had limited access and did not have "care, custody or control."

█ This court could go on at length and has, in fact, carefully studied many additional cases dealing with the interpretation of this exclusionary clause. The court is convinced, however, that there is no one common denominator which will serve to harmonize all of the decided cases. The court is convinced that different jurisdictions would simply reach different decisions on the same operative facts. In other words, there is a genuine split of authority on this issue. It thus appears to this court that the best course of action to follow in such a situation is to decide the case as it feels is necessitated by the Michigan decisional authority. In this regard then, the court must take into consideration the fact that the Michigan Court of Appeals has found this exclusionary clause to be "inherently ambiguous" and indicated extreme dissatisfaction with it, and that it should receive the narrowest of constructions. They have also indicated that importance should be attached to the fact as to whether the property is a readily movable chattel or is real estate or firmly affixed to the real estate. The court thus feels that the rationale of the decisions in *Klapper v. Hanover Insurance Company*, supra and *Leiter Electric Company v. Bituminous Casualty Corporation*, supra, are in keeping with what the Michigan decisions dictate. To the degree that the Michigan courts have cited other cases which do not, when carefully studied, fully support the *Klapper* or *Leiter Electric Company* decisions, it should

be noted that they have, in fact, taken from those decisions such parts as do support *Klapper* and *Leiter Electric Company*. Applied to the facts as found by this court in the case at bar then, it is felt that a decision is mandated that the exclusionary clause relied upon by the defendant is not applicable. In order to more fully explain its decision, the court will again consider the two contracts separately.

In connection with the work done at the Humble Oil site, it is clear that the work was done on property that was permanently affixed to the real estate, and that the owner of the real estate at all times exercised control over the property in question, and that Bigelow was merely given a limited right of access to the property for the purpose of performing its contract. This finding is further buttressed by the testimony indicating the limited degree of control that was actually given to Bigelow. Thomas Mooney, one of the Bigelow superintendents on the project, testified that at all times representatives of the owner, contractor and other subcontractors were on or near the premises and exercising supervisory control thereof as well as performing work therein. Specifically, Mr. Mooney testified:

"Q. At what time while you were supervising the removal of this refractory were any Humble people at that vessel?

"A. Well, they were at it, at least three or four times daily and I know that they went in after we were finished to inspect the vessels as well because—

"Q. You mean each day or—

"A. Yes, each day. And there was one inspector there from Parsons, Mr. Tate, he was there all day, practically, when we were shooting this Gunnite, and when we were ripping it out." (C–10)

Later, Mr. Mooney testified:

"A. Well, there was an engineer there from Nooter all the time, his name was Green, Mr. Green and Nooter

had men working there as well on the outside the time we were there.

"Q. What other people did you observe on Humble's property at this particular site of course, while you were there, anybody else you haven't told us about?

"A. Yes, there was a—Parsons had quite a few engineers there and one of the names was Mr. Busse, something like that, he was around the vessels quite a bit too and at least another two of Parsons' engineers, but the one that was there all the time was Mr. Tate and he was in charge of these Nooter vessels for Parsons." (C–12–13)

Similarly, the district manager for Bigelow testified:

"Q. And did I understand you to say that the Humble and Nooter and Parsons people were there during this period also?

"A. They were there all the time. We always had Humble, Parsons and occasionally Nooter people in the vessel actually while we were doing the work. As a matter of fact, when we were doing the installation, Mr. Tate from Parsons was in there all the time. I mean he was right there with our nozzle man and our finisher. He stayed there I would say ninety percent of the time." (C–47)

The court thus finds that the location, the size and the permanent attachment to the realty of the property being worked on by Bigelow, coupled with the general supervision and control exercised by the owner and the other contractors and subcontractors, made it impossible for Bigelow to have "care, custody and control" within the meaning of the insurance policy exclusion as interpreted by the Michigan courts.

As to the Charmin contract, the court similarly finds, from the facts more fully set forth earlier in this opinion, that the work being done by Bigelow was being performed on property that was perma-nently affixed to the real estate and was of a size and at a location that again indicated that what Bigelow had was limited access for the purpose of performing its work as opposed to the "care, custody or control" required by the exclusionary language. The depositions of those employees who were on the job site, particularly Thomas Maczko and John Hribovski (B), indicate clearly that the site at all times was under the complete control of the Charmin Paper Products Company. Further, that inspectors and supervisory personnel from Charmin and/or Babcock and Wilcox were constantly present either in a supervisory, inspection or related work capacity at all times that Bigelow was working on the boiler in question, and that such personnel were both inside and outside the boiler. Control exercised by Charmin is nowhere more dramatically illustrated than by the fact that they would not allow enough light in the boiler for the Bigelow employees to properly see to do their work, and that the Bigelow employees brought in their own light which was promptly removed by the Charmin supervisors.

Two other contentions or implied contentions of the defendant are worthy of comment at this point. The first is that the property damaged in both cases was that which the insured was working on, and thus it was "necessary to the insured's work", a criterion which the Michigan courts have said is important. There are two problems with this argument by defendant. The first is that, although the Michigan Supreme Court does quote this general principle of law, they also reverse and remand the *Pennington* case for a specific determination as to whether the property being worked on was affixed to the realty. Furthermore, whether it was affixed to the realty or not, the property damaged in *Pennington* was that upon which the insured was directly working and thus most certainly must have been "necessary" to his work.

Secondly, the word "property" is itself ambiguous. This is well illustrated by the decision in *Harris, Jolliff and Michel, Inc. v. Motorists Mut. Ins. Co.*, 21 Ohio App.2d 81,

255 N.E.2d 302 (1970). In *Harris*, the court had occasion to construe this exact clause when the defendant had denied coverage to the plaintiff contractor based upon the exclusion. In construing "property in the care, custody or control" of the insured, the court finds that the word "property" itself is susceptible of at least the following interpretations:

"1. The specific area of damage: i. e., a wall, a doorway, a window.

"2. A subdivision of the building: i. e., a room damage, a wing damage, a new addition, etc.

"3. The entire structure which sustained injury: i. e., the warehouse, the residence, the factory, etc." Id. at 305.

Further, the court says on this same point:

"The word 'property' as it refers to a building or structure capable of being in divided physical control, is inherently subject to these basically differing meanings." Id. at 306.

The testimony in the case at bar indicates in fact that the structures were in divided physical control—that they were under either construction or extensive repair and had numerous workmen supervisors and inspectors from different companies performing different tasks and operations all at approximately the same or overlapping times. The court in *Harris* then goes on to conclude:

"Where there is such an ambiguity in an exclusion, that meaning which excludes the least is necessarily the most liberal construction for the insured. . . Only where the insured has care, custody or control of the whole structure does the exclusion apply—and there is no application to partial situations." Id. at 306.

It is felt that the findings by the Michigan courts to the effect that the disputed exclusionary clause is "inherently ambiguous" dictate a finding such as that made in *Harris*.

The second contention of defendant in this regard is that a harsh result would be achieved by a finding such as this court has made. In support of this proposition, they point to the language in *Arrigo's Fleet*

*Service v. Aetna,* supra, to the effect that the purpose of the exclusionary clause in question is to:

"(1) Avoid greater moral hazard as far as the insurance company is concerned, and (2) to eliminate the possibility that the insurance company may become the guarantor of the insured's workmanship."

An examination of both of these reasons convinces the court that the decision reached in this case is not in fact unduly harsh on the defendant carrier.

Insofar as the "greater moral hazard" is concerned, the exact meaning is not clear. However, one interpretation is that property which is in the exclusive possession of an insured is obviously property that it is easier to fabricate or falsify claims in connection with. Similarly, property owned by the insured is excluded, at least in part, for the same reasons. The decided cases are in fact consistent with this line of reasoning, and almost universally hold that where the insured has brought property onto his premises or in some way controls it to the exclusion of all others that the exclusionary clause does in fact apply. The fact situation at bar is the exact opposite, however, as the insured was working on property far removed from his place of business, property which was on the premises of and under the close supervision of others, and property which was at all times in the observation and control of those who had a direct interest in seeing that the insured performed his work properly and did not negligently or otherwise injure the property being worked upon.

As to defendant's concern that they may become the "guarantor of the insured's workmanship," it appears to the court that this too is a groundless worry under circumstances such as is presented in the case at bar. To begin with, if they mean by that statement that they are going to have to pay claims occasioned by the negligent acts of the insured—they have merely highlighted the exact reason why an insured takes out a policy of insurance to begin with. Secondly, if in fact they want to exclude from coverage any property on which the

defendant is working and is damaged in a negligent yet foreseeable way, there is other language to which they could resort that would spell this out with far less ambiguity than "care, custody and control." Thirdly, an examination of the policy itself (Exhibit 2) indicates that the defendant carrier has also excluded the following from coverage:

"(k) To bodily injury or property damage resulting from the failure of the named insured's products or work completed by or for the named insured to perform the function or serve the purpose intended by the named insured . . .''

Thus, in the case at bar, if after the work at the Humble Oil site was completed the Gunnite applied by the insured had fallen off, there would obviously be no claim that could be made to the insurance company even though the resultant monetary loss to the insured and his responsibilities to the party with whom he had contracted would be as great as they are in this case. Similarly, if the new refractory material applied by Bigelow to the Charmin boiler had failed to protect it from the heat of the boiler, again the defendant carrier would have no liability and the loss would be that of the insured.

█ The test is not whether the insured negligently injured or damaged that upon which he was working, but whether in fact he had "care, custody and control" of the "property" in question. It should be pointed out that throughout this opinion, the court has consistently referred to the disputed exclusionary language as "care, custody or control" not unmindful of the fact that the clause in question also includes the language "or as to which the insured is for any purpose exercising physical control." The decisions referred to by the court in this opinion have all contained the language relative to "physical control," and in this opinion all references to the disputed "care, custody and control" clause are intended to be references to the full clause as it appears in the policy. *Elcar Mobile Homes, Inc. v. D. K. Baxter, Inc.*, 66 N.J.Super. 478, 169 A.2d 509 is helpful on this point.

" . . . there were added to the policy the words 'property as to which the insured for any purpose is exercising physical control.' In *Boswell*, we said that the words 'care, custody or control' were inherently ambiguous because 'they are words of art which have been the focus of considerable judicial construction' in many fields of the law. Therefore, the addition of the quoted words is mere tautology, as ambiguous as that which it purports to supplement." 169 A.2d 509, 514.

Of all the cases reviewed by the court covering this subject, the court considers *Elcar*, supra, to be the best reasoned. Although *Elcar* does not attempt to harmonize all of the conflicting decisions, it does, when read in its entirety, provide the most logical analysis of the problem consistent with the starting position that exclusionary clauses of this nature must be construed against the insured and that such clauses as they have been ruled in Michigan are "inherently ambiguous." Particularly pertinent is that part of the *Elcar* decision which points out that this clause has been the subject of considerable litigation, and that insurance carriers continue to use it notwithstanding. The suspicion is inevitable that notwithstanding isolated court decisions to the contrary that the clause in the main, because it is indeed ambiguous, works to the advantage of the insurance carriers. On this point an article cited in *Elcar* from the January, 1959, Insurance Law Journal is enlightening. The article entitled "Care, Custody or Control Exclusions" states at page ten:

"I might say that the insurance companies themselves in the past have done a lot toward perpetuating the confusion.

"You have heard the saying 'everyone talks about the weather but nobody does anything about it.' For years the same applied to liability policies of casualty companies. Although the companies complained about judicial interpretation about the wording affording coverage where no coverage was intended, no one ever changed the wording."

Further on this point, another well reasoned case with facts similar to the case at bar states:

> "If it be the intention of Buckeye, in policies of this type to exclude coverage for liability for damage, even though 'caused by accident,' to property as to which the insured by the terms of his contract has a duty to perform some work, it would appear that the employment of precise unambiguous language could have accomplished this result." *Innis v. McDonald*, Ohio Com.Pl., 150 N.E.2d 441, 445.

*Elcar* concludes, as does this court, in holding for the insured:

> "The insured is entitled to rely upon what he reads in the policy. He is not expected to know the 'fine distinctions between realty and personalty, or to understand the nuances of 'care,' 'custody,' 'control,' or similar terms."

■ Having found for the plaintiff, the court must now address itself to the damage issue. The testimony is clear and was not disputed by any evidence offered by the defendant to the effect that the amounts for which plaintiff Bigelow actually settled these claims were reasonable, and accordingly, plaintiff may have judgment in this amount. An additional question is presented, however, by plaintiff's claim for additional costs and expenses incurred as a result of having to settle these claims on his own when coverage was wrongfully denied by the insurance carrier. The court finds that the plaintiff is entitled to reimbursement for such reasonable expenses incurred as the proofs support. Authority for this is to be found in 14 *Couch on Insurance* 2d, Sec. 51:55, and the multitude of cases in support of that principle found in the annotations and pocket parts. As to the claim involving the Nooter Corporation—the original claim was $35,158.69. Plaintiff Bigelow ultimately negotiated a settlement of this claim for $31,697.32. The principal items of expense proved in connection with the settlement of this claim at trial concerned a settlement conference held in St. Louis, Missouri, involving executives of Big-

elow and their attorney. The attorney's time including attendance and expenses at the conference plus preparation for the conference was billed at $860.00. The four company personnel who attended plus their expenses were billed out at $1,120.00. The expenses for the use of a company airplane were billed out at $765.00. This resulted in a total outlay of $2,945.00 which this court finds to be reasonable and will allow as the settlement expense in connection with the Humble/Nooter matter.

On the Charmin settlement, the court reaches the conclusion that there are no proofs in the record to support any amount of incidental damages. It must be remembered in regard to this claim that the money for the damages was actually deducted from monies owed to Bigelow, and Bigelow's own witnesses testified that they felt the money deducted was a reasonable amount. Under those circumstances it is impossible to conclude that any significant sums were expended in this settlement. In addition, the one witness who testified on this matter for the plaintiff was simply unable to set any figures. Under the circumstances, expenses for the settlement of the Charmin claim will not be allowed.

Since this is a diversity action, interest on the judgment will be allowed in accordance with Michigan law. *Glens Falls Insurance Company v. Danville Motors, Inc.*, 333 F.2d 187 (C.A.6 1964).

The plaintiffs may prepare a judgment in conformity with this Opinion and present it to this court for entry after presenting it to the defendant for approval as to form and agreement on the correct monetary amounts of the judgment. In the event the parties are unable to agree, they may apply to this court for assistance and resolution of their dispute.