PREMONSTRATENSIAN FATHERS, Respondent, v. BADGER MUTUAL INSURANCE COMPANY and others, Appellants.

*No. 59. Argued January 8, 1970.—Decided March 31, 1970.*
(Also reported in 175 N. W. 2d 237.)

For the appellants there was a brief by *Kenneth M. Kenney* and *Wolfe, O'Leary, Kenney & Wolfe,* all of Milwaukee, and oral argument by *Kenneth M. Kenney.*

For the respondent there was a brief by *Everson, Whitney, O'Melia, Everson & Brehm* of Green Bay, and oral argument by *James L. Everson.*

CONNOR T. HANSEN, J. Although the insurers have divided their argument into two sections, the basis of the entire appeal is a consideration of the legal status of the coolers. If the coolers are determined to be common-law fixtures, and were such at the time of the construction of the building and the installation of the coolers, then they would have passed to the Fathers under the warranty deed of March 7, 1960, and they would be insured under the terms of the policy.[1] The issue then is whether these coolers constitute fixtures.

---

[1] "Fixtures are realty. They pass by transfer of title to the land unless specifically reserved in the writing. . . ." *Hannon v. Kelly* (1914), 156 Wis. 509, 514, 146 N. W. 512. "The principal significance of the determination that an object is a fixture is that it is thereafter treated as part and parcel of the land and may not be removed therefrom except by the owner of the realty or other person holding paramount rights in the fee. . . ." 35 Am. Jur. 2d, *Fixtures,* p. 700, sec. 2.

The rule which has developed in Wisconsin as to what constitutes a fixture is not really a comprehensive definition, but rather a statement of the factors which are to be applied to the facts and circumstances of a particular case to determine whether or not the property in question does constitute a fixture:

". . . Whether articles of personal property are fixtures, *i.e.*, real estate, is determined in this state, if not generally, by the following rules or tests: (1) Actual physical annexation to the real estate; (2) application or adaptation to the use or purpose to which the realty is devoted; and (3) an intention on the part of the person making the annexation to make a permanent accession to the freehold." [2]

It is the application of these tests to the facts of a particular case which will lead to a determination of whether or not an article, otherwise considered personal property, constitutes a common-law fixture, and hence takes on the nature of real property. The trial court in the instant case concluded that the evidence adduced at the trial established that the coolers in question are fixtures and hence part of the realty. Such findings cannot be set aside unless they are contrary to the great weight and clear preponderance of the evidence. [3] The trial court clearly enunciated the reasons for its decision in a thorough and well-reasoned opinion.

*Annexation.*

Annexation refers to:

". . . the act of attaching or affixing personal property to real property and, as a general proposition, an object

[2] *Standard Oil Co. v. La Crosse Super Auto Service* (1935), 217 Wis. 237, 240, 241, 258 N. W. 791. *See also Leisle v. Welfare Building & Loan Asso.* (1939), 232 Wis. 440, 444, 287 N. W. 739; *Auto Acceptance & Loan Corp. v. Kelm* (1962), 18 Wis. 2d 178, 182, 118 N. W. 2d 175; *Appliance Buyers Credit Corp. v. Crivello* (1969), 43 Wis. 2d 241, 252, 168 N. W. 2d 892.

[3] *Appliance Buyers Credit Corp. v. Crivello, supra.*

will not acquire the status of a fixture unless it is in some manner or means, albeit slight, attached or affixed, either actually or constructively, to the realty." [4]

It has been held in Wisconsin that physical annexation, although a factor to be considered in the determination, is of relative unimportance:

". . . it has often been said by this court that the matter of physical annexation of the article to the freehold is relatively unimportant. . . ." [5]

The trial court ably pointed out the physical facts which led to its conclusion that there is indeed annexation in this case. The more important of these are as follows: (1) The exterior walls of the cooler, in four instances, constituted the interior wall of another room. (2) In the two meat coolers, a meat hanging and tracking system was built into the coolers. These tracks were used to move large cuts of meat from the cooler area into the meat preparation areas, and were suspended from the steel girders of the building structure by means of large steel bolts. These bolts penetrated through the roof of the cooler supporting wooden beams, which, in turn, supported the tracking system. The tracking in the coolers was a part of a system of tracking throughout the rear portion of the supermarket. (3) The coolers were attached to hardwood plank which was, in turn, attached to the concrete floor of the supermarket. The attachment of the plank to the floor was accomplished through the use of a ramsetting gun. The planks were laid on the floor, and the bolts were driven through them into the concrete floor, where they then exploded, firmly fixing the coolers into place. There was a material placed on the planks which served both as an adhesive and as an insulation. (4) The floor of the coolers was specially

---

[4] 35 Am. Jur. 2d, *Fixtures*, p. 703, sec. 5.

[5] *Leisle v. Welfare Building & Loan Asso., supra*, page 444. See also *Standard Oil Co. v. La Crosse Super Auto Service, supra*; *Shields v. Hansen* (1930), 201 Wis. 349, 352, 230 N. W. 51.

sloped during the construction of the building so that the slope would carry drainage into a specially constructed drain in the concrete. In addition, four of the coolers were coated with a protective coating to seal the floors. In the freezer, a special concrete buildup was constructed in the nature of a trough, the purpose of which was to carry away moisture as frozen chickens melted. (5) A refrigeration unit was built into each cooler. The unit was suspended from the ceiling of the cooler, and tubing was run through the wall of the cooler to compressors located elsewhere in the store. (6) Electric lights and power receptacles were built into each cooler and were connected by electrical wiring through the walls and the ceiling of the cooler to the store's electrical power supply. (7) The walls of the cooler were interlocked, and set into the splines, the hardwood planks ramset into the concrete floor, in tongue and groove fashion.

These factors adequately support the conclusion that the coolers were indeed physically annexed to the premises. The insurers argue that the coolers were removable without material injury to the premises, which detracts from the annexation. There was a dispute in the evidence introduced at the trial, with the insurers' expert testifying that this type of cooler was easily severable from the building, while one of the members of the Jacobs family testified that when he removed some of the bolts from the floor following the fire, large sections of concrete would crack on the floor. This was a conflict for resolution by the trial court. In any event, the element of removability without material damage to the building no longer enjoys the position of prominence in the law of fixtures which it once held. It is now only one of the factors which is to be considered by the trial court.[6]

---

[6] "The relative ease with which an object annexed to realty may be removed, while not the sole test, is often considered in determining whether the object has become a fixture. . . ." 35 Am. Jur. 2d, *Fixtures*, p. 705, sec. 7.

Based on the evidence introduced, the finding of the trial court that the coolers were physically annexed to the premises is not contrary to the great weight and clear preponderance of the evidence.

### Adaptation.

Adaptation refers to the relationship between the chattel and the use which is made of the realty to which the chattel is annexed. The use of the realty was that of a retail grocery, commonly known as a supermarket. This was the intent of the parties at the time of the construction of the building, and the intent of the parties throughout the entire history of the business. The fact of operation has borne out this intent. In a business which carries fresh foods, frozen foods, produce, meats and butter, coolers used for storage and handling of these perishables are patently related to the use of the building. In fact, it would be hard to picture any equipment more closely related to the operation of a supermarket, where large quantities of perishables must, of necessity, be purchased for storage and processing.

The insurers raise a number of points to dispute this finding. They state: The coolers were not custom made; the coolers are useful not to the building, but to the use to which the building is put; the coolers could have been used anywhere; other coolers could have been used. There is no requirement that the coolers be custom made, but only that they be adapted to the use to which the building is put. The test here is not the adaptability to the building, but the adaptability to the use to which the building is put. The fact that other coolers could have been used, or that these coolers could have been used elsewhere, does not alter the fact that there was a close connection between these coolers and the retail grocery business conducted on the property. This finding of the trial court cannot be said to be against the great weight and clear preponderance of the evidence.

## Intent.

This court has repeatedly held that intent is the primary determinant of whether a certain piece of property has become a fixture.[7] The relevant intent is that of the party making the annexation. At the time of the construction of the supermarket and the installation of the coolers, both the Jacobs Realty Corporation and the Jacobs Brothers Stores, Inc., were in existence as separate legal entities. The title to the land in question was registered in the name of the Jacobs Realty Corporation, but the exact status of Jacobs Brothers Stores, Inc., is unclear at that date. There is no definitive evidence which demonstrates whether it was the Jacobs Realty Corporation or the Jacobs Brothers Stores, Inc., which purchased the coolers and caused them to be installed on the premises. The invoice from the manufacturer was sent to the "Jacobs Bros. Super Market," a nonexistent legal entity. The evidence introduced at the trial as to who paid for the coolers consisted of the testimony of Henry Jacobs. He did not remember which of the corporations issued the check in payment of the coolers; many of their records were burned; John, Norbert and Henry Jacobs paid for them through one of the corporations; and he was inclined to think it was Jacobs Realty Corporation that purchased them. Thus, there is no evidence from which it can be positively asserted that either Jacobs Realty Corporation or Jacobs Brothers Stores, Inc., purchased the coolers.

In its decision, the trial court found, as a reasonable and legitimate inference from all the facts and circumstances surrounding the placement of the coolers onto the realty, that there was an intention that the coolers became a permanent accession to the realty; that when Jacobs Realty Corporation conveyed the land together with all buildings and improvements thereon to Jacobs

[7] *Old Line Life Ins. Co. v. Hawn* (1937), 225 Wis. 627, 275 N. W. 542; *Shields v. Hansen, supra.*

Brothers Stores, Inc., the intention still prevailed that the coolers were a permanent accession to the realty; and that the same intention still prevailed when Jacobs Brothers Stores, Inc., conveyed the building and improvements to the plaintiff, and when the plaintiff leased the premises (the land, with all buildings and improvements thereon) back to the corporation as lessee.[8]

The trial court's decision is based upon the proposition that Jacobs Realty Corporation, the owner of the land and building, purchased and installed the coolers on the property. This is not against the great weight and clear preponderance of the evidence since this is an inference which can be drawn from the testimony of Mr. Jacobs and from other circumstances surrounding the construction of the building and the installation of the coolers. We, therefore, sustain this finding, holding that the Jacobs Realty Corporation was the purchaser and installer of the coolers. It follows that the coolers were common-law fixtures from their installation. As this court has stated:

". . . Although it is true that, in applying that doctrine, the question of whether such machines constitute fixtures is largely one of intent, that intent may be considered established conclusively by the fact that the machines in question were clearly adapted to, *and were in fact put by the owner of the realty and the machines to, the use to which he devoted the realty and the installed machines as an entirety. . . .*" (Emphasis added.) [9]

---

[8] The trial court's findings of fact and conclusions of law did include the following: "8. That the Court further finds as facts, the facts stated by the Court in its written decision dated October 17, 1968, incorporating them herein by reference, and making them a part of these Findings of Fact." Any facts stated in the written decision are thus incorporated into the formal findings of fact and have the same effect as if fully stated.

[9] *McCorkle v. Robbins* (1936), 222 Wis. 12, 17, 267 N. W. 295; *see also Hannon v. Kelly, supra; Gunderson v. Swarthout* (1899), 104 Wis. 186, 80 N. W. 465.

" '. . . But where property is adapted to the use to which the realty is devoted, [by the owner] the use thereof in such manner furnishes such strong evidence of intent to make it a part of the freehold as not to be overcome by bookkeeping practices . . . .' " [10]

The coolers were fixtures when installed; passed to Jacobs Brothers Stores, Inc., through the warranty deed; subsequently passed to the Fathers through that warranty deed; and are in fact fixtures within the meaning of the coverage clause of the insurance policy in this case. The decision of the trial judge was not against the great weight and clear preponderance of the evidence.

Our decision to affirm the trial court's determination that the coolers were purchased and installed by Jacobs Realty Corporation, with the intention that they become fixtures, is dispositive of a number of other issues raised by the defendants. The coolers would not be considered trade fixtures, since that doctrine is applied between landlord and tenant. We do not consider the fact that "Jacobs Stores, Incorporated," executed a chattel mortgage in 1958, which included the coolers, to be significant in determining their status as related to Jacobs Realty Corporation. Furthermore, there was no such legal entity as "Jacobs Stores, Incorporated." In like manner, the chattel mortgage executed in 1963 by Jacobs Brothers Stores, Inc., was irrelevant as to the intent of the Jacobs Realty Corporation at the time of the annexation to the realty, and was therefore properly rejected by the trial judge. Also, the argument of the defendants that the provision in the lease between the plaintiff and Jacobs Brothers Stores, Inc., established that the coolers were in fact trade fixtures and remained the property of Jacobs Brothers Stores, Inc., must fail. This provision in the lease appears to be a contractual restatement of

[10] *State ex rel. Gisholt Machine Co. v. Norsman* (1919), 168 Wis. 442, 446, 169 N. W. 429.

the law of trade fixtures which relates to property brought onto the premises by the lessee. *Auto Acceptance & Loan Corp. v. Kelm, supra.*

Defendants further submit that the trial court incorrectly considered the basic amount of the insurance policy in relation to the amount of loss in the event that the coolers were not covered by the policy. The trial court concluded that if the coolers were not covered under the policy, then the Fathers were paying a premium on approximately $20,000 worth of nonexistent insurance. The insurers argue that this policy was a replacement-cost type policy, containing a coinsurance clause, and that the lease between the Fathers and Jacobs Brothers Stores, Inc., required the policy to be in an amount of at least $120,000. The insurers' argument here is correct in light of the fact that the amount of the policy was required by the lease. The amount of the insurance which was taken out does not necessarily reflect what was covered in this case. However, having determined that the coolers were the property of the plaintiff, the error was not prejudicial.

*By the Court.*—Judgment affirmed.