CINCINNATI INSURANCE
COMPANY, Plaintiff,

v.

FEDERAL INSURANCE COMPANY,
as Subrogee of Visioneering, Inc., and
Galaxy Machine and Retrofit, a Michigan Corporation, Defendants.

No. 00–73415.

United States District Court,
E.D. Michigan,
Southern Division.

Sept. 27, 2001.

*OPINION AND ORDER DENYING PLAINTIFF'S MOTION FOR SUM-MARY JUDGMENT AND GRANT-ING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT*

ROBERTS, District Judge.

## I. INTRODUCTION

The operative facts of this case are as follows: Defendant Galaxy Machine and Retrofit ("GMR") purchased a Commercial General Liability Policy from Plaintiff Cincinnati Insurance Company ("CIC"). Defendant Federal Insurance Company ("FIC") insured Visioneering, Inc. GMR and Visioneering entered into a service contract under which GMR was to perform work at the Visioneering facility. In the process, a motor assembly unit was damaged on Visioneering's property. Defendant FIC paid Visioneering for damages and lost business income ($642,716.16). Defendant FIC then filed suit in state court against Defendant GMR for reimbursement of the amount it paid to Visioneering. Defendant GMR requested Plaintiff CIC to defend and indemnify it if it is found liable in that state court action. CIC refused. Instead, it filed this federal court action. CIC seeks a declaratory judgment that it has no responsibility to defend and indemnify GMR, based on certain exclusions in the Commercial General Liability Policy it issued. Before the Court are motions for Summary Judgment filed by all parties.

For the reasons stated below, the Court **DENIES** Plaintiff CIC's Motion for Summary Judgment [Doc. # 39] and **GRANTS** Defendants' FIC's and GMR's [Doc. # 22 and Doc. # 5] Motions for Summary Judgment.

## II. BACKGROUND

Visioneering is an engineering company located in Fraser, Michigan which manufactures parts for the automobile and aerospace industries. In 1996, Visioneering purchased a milling machine known as a Cincinnati 5 Axis Profiler. It was manufactured by Cincinnati Machine in 1967. In 1984, it was retrofitted, with the original hydraulic motor drive system being replaced by electric motor drives with electronic controls.

Visioneering contracted with GMR for reassembly and installation of the machine at the Visioneering facility. GMR submitted a proposal to Visioneering on September 11, 1996, which outlined the services to be performed. *(See Exhibit A attached to Plaintiff's Motion for Summary Judgment & Exhibit 1 attached to GMR's Motion for Summary Judgment).* Since one of the exclusions (j (4)) in the CIC policy

precludes coverage to GMR if the milling machine was in GMR's care, custody or control at the time of the accident, each party puts a different spin on the amount and degree of control GMR and/or Visioneering had over the project.

Notwithstanding, the contract between GMR and Visioneering delineates the duties and responsibilities of Visioneering and GMR. It provides that: (1) all major components will be assembled by GMR, including ball screws, motors, and support bearing, way removal/installation not accounted for; (2) all documentation will be supplied by Visioneering; (3) all parts, electrical, electronic and mechanical, that are required will be supplied by Visioneering; (4) final leveling and squaring will be performed by GMR; (5) and, GMR will not be responsible for OSHA requirements. Further, any prior modifications made or required, in the future, will be the responsibility of Visioneering and/or machine seller; (6) GMR will cover overtime costs to 50 hours per man per week. Additional overtime required by Visioneering will be charged 18.00 per hour; (7) GMR will perform setup and debug of the machine and control; (8) GMR will remain in Visioneering's Facility for three days after running to assist with any minor problems; (9) GMR will clean and flush all hydraulic units and way lube systems; (10) GMR will reassemble the tilt axis and accessories, indicating fixtures to be manufactured by Visioneering per GMR specifications; (11) due to the fact that all services will be billed on a time and material basis, GMR technicians will punch in and out at Visioneering Facility; (12) Visioneering will be responsible for all parts and laser calibration service; (13) GMR will be supplied a minimum of one person to assist in the rebuild; (14) Visioneering agreed to pay one hour of travel time per person per day and mileage expense of .35 per mile for one vehicle; and, (15) services will be billed at GMR's discounted service rates. *Id.*

On January 20, 1997, near the end of the project, Valent Bachleda, a GMR employee who worked on the project on a daily basis, was preparing to test and power up the motor. In order to do this it was necessary to remove the five separate motors on the machine. Mr. Bachleda had already separated several motors and was separating the motor on the A-axis. He pulled a shaft through that was in the brake assembly, which disabled the brake in that axis, (*Exhibit 2 of GMR's Motion for Summary Judgment, Bachleda Dep., pp. 41–42* ). When the brake assembly became disengaged, the motor instantly fell all the way down the axis. *Id. At 46–47.* The motor struck Mr. Bachleda in the shoulder and caused him to fall where he became trapped. Another much larger motor also fell and crushed his leg. *Id. at 47–48.* The motor had to be removed from Mr. Bachleda's leg with a crane. *Id. At 49–50.* An ambulance was called. Mr. Bachleda was rushed to the hospital. *Id. At 52–53.* Mr. Bachleda suffered severe cuts on his elbow, shoulder, and head, requiring stitches. *Id.* He broke his right leg in two places, shattered his knee and broke two fingers. *Id.* He had extensive reconstructive surgery on his knee; pins and screws were installed to hold his leg together. *Id.*

There was extensive damage to the machine as a result of this accident. GMR offered to repair the damage and complete the project. (*See Exhibit 3 of GMR's Motion for Summary Judgment, Passmore's Dep. pg. 25).* However, Visioneering fired GMR from the project and GMR did not perform any more work. *Id. at 25–26.* Instead of accepting GMR's offer, Visioneering submitted a claim to its insurer, FIC, for $355,486.16 in repair costs, and $294,358.00 for business interruption loss-

es, totaling, $642,716.16. GMR employees had no access to the machine after the accident occurred. *Id. at 26.* FIC paid on Visioneering's claim. It is this amount that is at issue in the state court action.

CIC asserts here that it has no obligation to defend or indemnify under the CIC policy pursuant to Exclusion j(4) and Exclusion j(6).[1] These exclusions are as follows:

j(4) This insurance does not apply to ... Property damage to pesonal property in the care, custody or control of an insured;

j(6) This insurance does not apply to ... Property damage to that particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.

### III. *STANDARD OF REVIEW*

Summary judgment is appropriate only when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c). The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury, or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). After adequate time for discovery and upon motion, Rule 56(c) mandates

summary judgment against a party who fails to establish the existence of an element essential to that party's case and on which that party bears the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

The movant has an initial burden of showing "the absence of a genuine issue of material fact." *Celotex,* 477 U.S. at 323, 106 S.Ct. 2548. Once the movant meets this burden, the non-movant must come forward with specific facts showing that there is a genuine issue for trial. *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

The non-moving party must do more than show that there is some metaphysical doubt as to the material facts. *Pierce v. Commonwealth Life Ins. Co.,* 40 F.3d 796, 800 (6th Cir.1994) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538(1986)). It must present significant probative evidence in support of its opposition to the motion for summary judgment in order to defeat the motion for summary judgment. *Moore v. Philip Morris Companies,* 8 F.3d 335, 339–40 (6th Cir.1993). If, after adequate time for discovery, the party bearing the burden of proof fails to make a showing sufficient to establish an essential element of his claim,

---

**1.** Within CIC's Statement of Case for Status Conference, it claims that Exclusions k, l and m are also applicable in this case. However, when CIC filed its Motion for Summary Judgment, after GMR's court filing, it made no arguments relative to Exclusions k, l, and m, nor were these exclusions mentioned in its Response to GMR's Motion for Summary Judgment. Moreover, within the text of CIC's Brief in Support of its Motion for Summary Judgment, CIC states that there are at least two exclusions (i.e., j(4) and j(6)) under which this case falls, thus requiring summary judgment in CIC's favor.

Since CIC does not refute GMR's claim that Exclusions k, l and m do not apply to this case; and, CIC foregoes several opportunities to present an argument, response or reply relative to these issues (i.e. in its Motion for Summary Judgment, CIC's Response to GMR's Motion for Summary Judgment, CIC's Response to Federal's Motion for Summary Judgment, CIC's Reply to its own Motion for Summary Judgment), the Court finds that CIC has abandoned those claims and reduced the number of exclusions it maintains apply in this matter to j(4) and j(6).

summary judgment is appropriate. *Celotex,* 477 U.S. at 322–24, 106 S.Ct. 2548.

## IV. *APPLICABLE LAW & ANALYSIS*

### A. Applicable State Law

 Michigan law applies in this case. *Aetna Cas. & Sur. Co. v. Dow Chem. Co.,* 883 F.Supp. 1101 (E.D.Mich.1995). A federal court deciding a diversity case under state law must apply the law of the state's highest court. If the state's highest court has not decided the applicable law, the federal court must ascertain the state law from "all relevant data." *Bailey v. V. & O Press Co.,* 770 F.2d 601, 604 (6th Cir.1985). A state's intermediate appellate court decision is a "datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise." *FL Aerospace v. Aetna Casualty & Sur. Co.,* 897 F.2d 214, 218–19 (6th Cir.) *(quoting West v. American Tel. & Tel. Co.,* 311 U.S. 223, 237, 61 S.Ct. 179, 85 L.Ed. 139 (1940)) A federal court may also consider decisions from other jurisdictions. *Bailey,* 770 F.2d at 604.

### B. General Rules of Contract Interpretation in Michigan

 Insurance policies are contracts, and their meaning is to be interpreted according to ordinary principles of contractual interpretation. *See Prestige Cas. Co. v. Michigan Mut. Ins. Co.,* 99 F.3d 1340, 1350 (6th Cir.1996). Whether a contract is ambiguous is a question of law for the court. *Steinmetz Elec. Contractors v. Local Union No. 58,* 517 F.Supp. 428, 432 (E.D.Mich.1981); *Mayer v. Auto–Owners Ins. Co.,* 127 Mich.App. 23, 27, 338 N.W.2d 407, 409 (1983). Further, construction of a contract, whether it is ambiguous or unambiguous, is a question of law for the court. *Petovello v. Murray,* 139 Mich.App. 639, 642, 362 N.W.2d 857, 858 (1984); *Fragner*

*v. American Community Mut. Ins. Co.,* 199 Mich.App. 537, 540, 502 N.W.2d 350, 352 (1993). The Michigan Supreme Court has held that exclusion clauses in insurance policies are to be strictly construed against the insurer and that ambiguous contract provisions also must be construed against the insurer and in favor of the insured. *Farm Bureau Mut. Ins. Co. v. Stark,* 437 Mich. 175, 468 N.W.2d 498, 501 (1991).

 A contract which admits of but one interpretation is unambiguous. *Fragner,* 199 Mich.App. at 540, 502 N.W.2d 350. In contrast, a contract provision is ambiguous if it is capable of two or more constructions, both of which are reasonable. *Petovello,* 139 Mich.App. at 642, 362 N.W.2d at 858. Where possible, the intent of the parties is to be drawn from the four corners of the instrument. *Rogers v. Great Northern Life Ins. Co.,* 284 Mich. 660, 279 N.W. 906, 908 (1938). If a contract is clear and unambiguous, the court must enforce the contract as written, according to its plain meaning, *Clevenger v. Allstate Ins. Co.,* 443 Mich. 646, 654, 505 N.W.2d 553, 557 (1993), without looking to extrinsic evidence. *Upjohn Co. v. New Hampshire Ins. Co.,* 438 Mich. 197, 205 n. 6, 476 N.W.2d 392, 396 n. 6 (1991). It is improper for the court to ignore the plain meaning of the policy's language in favor of a technical or strained construction. *Arco Indus. Corp. v. Travelers Ins. Co.,* 730 F.Supp. 59, 66 (W.D.Mich.1989). If the contract is ambiguous, the court must determine the intent of the parties. *Michigan Millers Mut. Ins. Co. v. Bronson Plating Co.,* 197 Mich.App. 482, 494–95, 496 N.W.2d 373, 379 (1992), aff'd, 445 Mich. 558, 519 N.W.2d 864 (1994). The function of the court is to determine and give effect to the parties' intent as discerned from the policy's language, looking at the policy as a whole. *Auto–Owners v. Churchman,* 440

Mich. 560, 566, 489 N.W.2d 431, 434 (1992). Ambiguous terms in an insurance policy are construed in favor of the insured. *Arco Indus. Corp. v. Am. Motorists Ins.*, 448 Mich. 395, 402–03, 531 N.W.2d 168, 172 (1995).

## C. CIC's Duty to Defend & Indemnify

An insurer's duty to defend depends on the substance of the allegations in the third-party complaint against the insured. *See, e.g., Pattison v. Employers Reinsurance Corp.*, 900 F.2d 986, 988 (6th Cir.1990) (applying Michigan law); *Allstate Ins. Co. v. Freeman*, 432 Mich. 656, 662–63, 443 N.W.2d 734 (1989). The duty of an insurance company to provide a defense in an underlying tort action depends upon the allegations in the complaint and extends to allegations which 'even arguably come within the policy coverage.' ... However, it is equally clear that an insurer's duty to defend and indemnify does not depend solely upon the terminology used in a plaintiff's pleadings. Rather, 'it is necessary to focus on the basis for the injury and not the nomenclature of the underlying claim in order to determine whether coverage exists.... [S]o must the allegations be examined to determine the substance, as opposed to the mere form, of the complaint.' *Freeman*, 432 Mich. at 662–63, 443 N.W.2d 734 (citations omitted). The court must resolve any doubt as to the duty to defend in favor of the insured. *Id.*

In fact, the insurer must defend a lawsuit even if there are theories of liability that the policy does not cover, so long as there are theories of recovery that fall within the policy's scope. *Dochod v. Central Mut. Ins. Co.*, 81 Mich.App. 63, 264 N.W.2d 122 (Mich.Ct.App.1978). *See Detroit Edison Co. v. Michigan Mut. Ins. Co.*, 102 Mich.App. 136, 301 N.W.2d 832, 835 (1980) (insurer has a duty to defend so long as the allegations "even arguably come within the policy coverage."). *See*

*also Oscar W. Larson Co. v. United Capitol Ins.Co.*, 64 F.3d 1010 (6th Cir.1995).

It is well settled in Michigan that an insurer's duty to defend is broader than its duty to indemnify. *Auto–Owners Ins. Co. v. City of Clare*, 446 Mich. 1, 15, 521 N.W.2d 480 (1994). In order to determine whether an insurer has a duty to defend its insured, this Court must look to the language of the insurance policy and construe its terms to find the scope of coverage of the policy. *Radenbaugh v. Farm Bureau General Insurance Company of Michigan*, 240 Mich.App. 134, 610 N.W.2d 272 (2000).

## D. Whether the Visioneering Milling Machine was "Personal Property in the Care, Custody or Control" of GMR so as to Bring it Within the Realm of Exclusion j(4) of the Insurance Policy

The "bodily injury and property damage liability" section of GMR's insurance policy with CIC provides:

> We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or property damage" to which this insurance applies. We will have the right and duty to defend any "suit" seeking those damages. We may at our discretion investigate any "occurrence" and settle, any claim or "suit" that may result.

*(Exhibit 10 of GMR's Motion for Summary Judgment, pg. 1 of 13).* The j(4) exclusion states:

> This insurance does not apply to ... Personal property in the care, custody or control of an insured. j(4). *Id. At pg. 3 of 13.*

At oral argument held on these motions, counsel for Plaintiff CIC conceded that as between Exclusions j(4) and j(6), j(4) was not his strongest argument. For good reason. In order to prevail on this argu-

ment, Plaintiff CIC would have to demonstrate that as a matter of law, the milling machine that GMR worked on was GMR's "personal property" when the accident occurred. GMR contends, convincingly, that the milling machine was a fixture and, further, that it did not have care, custody or control over the Visioneering milling machine. For those reasons, GMR argues that the exclusion simply does not come into play.

CIC on the other hand does not really address the personal property v. fixture issue, but rather deals solely with the argument that the milling machine was in the care, custody and control of GMR at the time of the accident, and therefore, the exclusion is applicable.

### 1. Fixture v. Personal Property

GMR cites *Wayne County v. Britton Trust*, 454 Mich. 608, 563 N.W.2d 674 (1997), which provides this guidance to distinguish between personal property and fixtures:

> Property is a fixture if the following three criteria exist: First, annexation to the realty, either actual or constructive; second, adaptation or application to the use or purpose to which that part of the realty to which it is connected is appropriated; and third, intention to make the article a permanent accession to the freehold.

*Britton Trust, supra, quoting, Morris v. Alexander,* 208 Mich. 387, 175 N.W. 264 (1919).

With respect to the first factor (i.e., description of annexation), the *Britton Trust* court stated:

> The act of attaching or affixing personal property to real property and, as a general proposition, an object will not acquire the status of a fixture unless it is in some manner or means, albeit slight, attached or affixed, either actually or constructively, to the realty. That is, if

the object is not attached to the land or to some structure or appliance which is attached to it, it will retain its character as personalty even though intended for permanent use on the premises.

*Id.* at 615, 563 N.W.2d 674.

With respect to the second factor (i.e., description of adaptation), the *Britton Trust* court stated that there was no Michigan case on point. However, the court cited a case from the Wisconsin Supreme Court, *Premonstratensian Fathers v. Badger Mut. Ins. Co.*, 46 Wis.2d 362, 369, 175 N.W.2d 237 (1970), which defined adaptation as "the relationship between the chattel and the use which is made of the realty to which the chattel is annexed." *Id.* at 618, 175 N.W.2d 237.

With respect to the third factor, the *Britton Trust* court stated:

> This Court examines the objective visible facts to determine whether intention to make the article a permanent accession to the realty exists ... The surrounding circumstances determine the intent of the party making the annexation, not the annexor's secret subjective intent ... Intent may be inferred from the nature of the article affixed, the purpose for which it was affixed, and the manner of annexation.

*Id.* at 619, 563 N.W.2d 674 [citations omitted].

The pertinent characteristics of the "Cincinnati 5–Axis Profiler (i.e., milling machine) are as follows:

1. The machine was affixed to the Visioneering facility at the time of the accident. *(Exhibit 4 of GMR's Motion for Summary Judgment, # 19 of FIC's Response to Requests for Admissions).*

2. The milling machine consists of multiple components and weighs over 200 tons. *(Exhibit 5 of GMR's Motion for*

*Summary Judgment & Exhibits 2–5 of CIC's Motion for Summary Judgment).*

3. The foundation of the machine is poured concrete which is part of the floor in the Visioneering facility. *(Exhibit 5 of GMR's Motion for Summary Judgment & Exhibit 2 of GMR's Motion for Summary Judgment, Bachleda Deposition, pp. 163–64 & Exhibits 2–5 of CIC's Motion for Summary Judgment ).*

4. The machine is anchored and bolted into the cement foundation at 38 different locations and is integrated into the Visioneering building (i.e., it is difficult to determine where the machine begins and the Visioneering Building begins.) *(Exhibit 2 of GMR's Motion for Summary Judgment, Bachleda's Deposition, pp. 21, 163–64).*

5. Visioneering uses the milling machine in the regular course of its business. *(Exhibit 4 of GMR's Motion for Summary Judgment, # 18 of FIC's Response to Requests for Admissions).*

6. The milling machine parts, which were to be reassembled and installed at the Visioneering facility, had to be transported to the company in several large trucks. *(CIC's Motion for Summary Judgment, pg. 3 of Brief).*

7. While the milling machine could be removed from the Visioneering building, it could not be removed in its entirety (i.e., it must be taken apart and removed in pieces) because the pieces are "too large to be put on the highway or rail." *(Exhibit 2 of GMR's Motion for Summary Judgment, Bachleda's Deposition, pg. 165).*

Applying the *Britton* test to these undisputed characteristics of the milling machine, the Court finds that the milling machine is a fixture. Importantly, FIC admits in its Response to Requests for Admissions that the milling machine is annexed to the Visioneering facility.

Secondly, (i.e., adaptation to purpose of realty factor), CIC states in its brief that "Visioneering Inc., is an engineering company located in Fraser, Michigan which manufactures parts for the automobile and aerospace industries." *(CIC's Motion for Summary Judgment, pg. 2 of brief).* FIC admitted in its Response to Requests for Admissions that Visioneering, Inc. uses the milling machine in the regular course of its business (i.e., manufacturing and finishing parts and equipment for the aerospace industry).

Finally, (i.e., intent to make permanent factor), the fact that the machine weights approximately 200 tons, was affixed to the Visioneering facility with concrete, and 38 different bolts and anchors were used to secure the machine into the cement foundation, persuades this Court that Visioneering's intent to make the milling machine a permanent accession to its facility can be inferred "from the nature of the article affixed, the purpose for which it was affixed, and the manner of annexation." *Britton Trust, supra,* at 619, 563 N.W.2d 674.

The Court is also persuaded by the holding in *Tuinier v. Charter Township of Bedford,* 235 Mich.App. 663, 599 N.W.2d 116 (1999). The court held that polyethylene greenhouses, affixed to the ground by bolts in the cement foundation, were fixtures despite the fact that the greenhouses could be disassembled and moved. *Id.* at 665, 672, 599 N.W.2d 116. The *Tuinier* court stated:

> Although it is possible for petitioner to disassemble and move the greenhouses, the evidence does not establish that the greenhouses have been moved or disassembled on a regular basis."

*Id.* at 672, 599 N.W.2d 116. Since the accident in this case occurred in January 1997 and now, more than four years later, the milling machine remains in the Visio-

neering facility, being actively used in the regular course of its business, the Court finds that the Cincinnati 5 Axis Profiler, like the greenhouses in *Tuinier*, is not disassembled and moved on a regular basis, and is, therefore, a fixture and not personal property.

## 2. Care, Custody & Control

For the j(4) exclusion to apply, the property must be both personal property *and* "in the care, custody or control" of the insured. Since the Court finds the milling machine to be a fixture rather than personal property, there is no need to address whether the milling machine was in the care, custody or control of GMR. Suffice it to say, however, that the Court finds the holding of *Bigelow–Liptak Corporation v. Continental Insurance Company*, 417 F.Supp. 1276 (E.D.Mich.1976) to be controlling and to dictate that the Profiler was not in the care, custody and control of GMR.

After a review of both the facts and the law on the "care, custody and control" exclusion clauses, as well as other relevant case law, including those cases cited here by CIC, the *Bigelow–Liptak* court held:

... there is a genuine split of authority on this issue. It thus appears to this court that the best course of action to follow in such a situation is to decide the case as it feels is necessitated by the Michigan decisional authority. In this regard then, the court must take into consideration the fact that the Michigan Court of Appeals has found this exclusionary clause to be "inherently ambiguous" and indicated extreme dissatisfaction with it, and that it should receive the narrowest of constructions. They have also indicated that importance should be attached to the fact as to whether the property is readily movable chattel or is real estate or firmly affixed to the real estate. The court thus feels that the rationale of the decisions in

*Klapper v. Hanover Insurance Company, supra* and *Leiter Electric Company v. Bituminous Casualty Corporation, supra,* are in keeping with what the Michigan decisions dictate ... Applied to the facts as found by this court in the case at bar, it is felt that a decision is mandated that the exclusionary clause relied upon by the defendant is not applicable.

*Id.* at 1286.

\* \* \* \* \* \*

In connection with the work done at the Humble Oil site, it is clear that the work was done on property that was permanently affixed to the real estate, and that the owner of the real estate at all times exercised control over the property in question, and that Bigelow was only given a limited right of access to the property for the purpose of performing its contract. This finding is further buttressed by the testimony indicating the limited degree of control that was actually given to Bigelow. Thomas Mooney, one of the Bigelow superintendents on the project, testified that at all times representatives of the owner, contractor and other subcontractors were on or near the premises and exercising supervisory control thereof as well as performing work therein.

*Id.*

\* \* \* \* \* \*

The court thus finds that the location, the size and the permanent attachment to the realty of the property being worked on by Bigelow, coupled with the general supervision and control exercised by the owner and the other contractors and subcontractors, made it impossible for Bigelow to have "care, custody and control" within the meaning of the insurance policy exclusion as interpreted by the Michigan courts. As

to the Charmin contract, the court similarly finds, from the facts more fully set forth earlier in this opinion, that the work being done by Bigelow was being performed on property that was permanently affixed to the real estate and was of a size and at a location that again indicated that what Bigelow had was limited access for the purpose of performing its work as opposed to the "care, custody or control" required by the exclusionary language.

*Id.* at 1287.

CIC sparsely addresses the issues raised in *Bigelow.* CIC states that Valent Bachleda:

> alone ... removed the motors so that the electrical controls could be tested. No one supervised this work nor was any one from Visioneering even present when the incident occurred. Bachleda confirmed that he personally rebuilt each component of the machine. Visioneering merely approved or disapproved individual changes in the unit and may have performed some minor repairs as well ... Mr. Bachleda, however, was not assembling the machine at the time of this incident. Instead the assembly was essentially complete [2] and he was in the process of testing the controls ... When Valant Bachleda and Jim Peters of Galaxy performed their work under this section of the contract, the milling machine was exclusively within their care, custody or control.

*(CIC's Motion for Summary Judgment, pp. 20–21 of Brief).* The problem with CIC's argument is that it provides no documentary support for these statements. Whereas, GMR provides the deposition

testimony of Mr. Bachleda who states that: (1) Al Winters supervised everything that he was involved in at Visioneering; (2) all of the work was performed at Visioneering; (3) the milling machine was owned by Visioneering; (4) there were always other Visioneering employees around when he was working; (5) he did not have a key to the Visioneering facility; (6) his time card was reviewed by Al Winters; (7) he was closely supervised by Al Winters; (8) Al Winters "micromanaged the whole project;" (9) Visioneering employees worked on the project when Mr. Bachleda was not in the facility. *(Exhibit 2 of CIC's Motion for Summary Judgment, pp. 11,–16, 19).*

GMR as well as CIC attached a copy of the proposals and contractual agreements with Visioneering, but these documents do not support CIC's contention that GMR was in charge of the project and was working unsupervised (i.e., care, custody and control).

On these facts, and in accord with *Bigelow,* the Court finds GMR was merely given a limited right of access to the Visioneering property for the purpose of performing its contract. The j(4) exclusion, then, is totally inapplicable to the facts of this case.

**E. Whether the j(6) "Your Work" Exclusion Applies**

■ Section j(6) excludes from coverage "[t]hat particular part of any property that must be restored, repaired or replaced because 'your work' was incorrectly performed on it."

■ This exclusion must be placed in the context of what the policy does insure.

---

**2.** Noticeably, CIC alters its version of the facts depending upon what legal argument is being made. When arguing that GMR had "care, custody and control" over the milling machine, CIC maintains that the "assembly was essentially complete." However, when

CIC argues that the milling machine is not a fixture, then CIC contends that the project is merely in the "process of being installed" and not affixed to the realty. *(CIC's Motion for Summary Judgment, pg. 19 of Brief).*

The Cincinnati Insurance policy provides coverage for property damage caused by an "occurrence". Section V. 12. of the policy defines "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." (GMR's Response, Exhibit 10). Michigan courts have settled upon the following definition of "accident" when it is contained in an insurance contract definition of "occurrence":

> An "accident" within the meaning of policies of accident insurance, may be anything that begins to be, that happens, or that is a result which is not anticipated and is unforeseen and unexpected by the person injured or affected thereby—that is, takes place without the insured's foresight or expectation and without design or intentional causation on his part. In other words, an accident is an undesigned contingency, a casualty, a happening by chance, something out of the usual course of things, unusual, fortuitous, not anticipated and not naturally to be expected.
>
> *Frankenmuth Mut. Ins. Co. v. Kompus,* 135 Mich.App. 667, 678, 354 N.W.2d 303 (1984), lv. den. 421 Mich. 863 (1985); *Guerdon Ind. Inc. v. Fidelity & Cas. Co. of New York,* 371 Mich. 12, 18–19, 123 N.W.2d 143 (1963), *quoting* 10 Couch on Insurance (2d ed), Section 41:6, pg. 27.

The circumstances which led to this coverage dispute have been outlined above, *Infra.* CIC contends that the circumstances were all due to faulty workmanship by GMR, bringing the j(6) exclusion into play. In support of its "faulty workmanship" argument, CIC points to the allegations in the complaint filed by FIC against GMR in state court. This complaint alleges, among other things, negligence on the part of GMR in the repair, servicing, refurbishing, equipping and retrofitting of the Cincinnati 5–Axis profiler.

On the other hand, FIC and GMR contend that this was a classic industrial accident which falls within the definition of "occurrence" and within the terms of coverage of the CIC policy. Even if the positions taken by FIC in the two lawsuits are inconsistent, FIC argues that that does not change the fact that the policy should provide coverage in the event of negligence, if damage is done to property other then GMR's.

CIC cites several cases in support of its position that due to GMR's "faulty workmanship" the milling machine had to be repaired, thus bringing this matter within the j(6) exclusion. However, none of the cases cited by CIC is factually on point. It is true that in those cases, there was damage to a structure or a machine or a system that the insured was working on, and as a result the insured sought insurance coverage, which was denied under language similar to the j(6 )exclusion here. However, in those cases, the damage arose because there was a defect in materials used by the insured or because of some alleged negligence in the construction, installation or repair of the property upon which the insured was working.

For example, in *Action Auto Stores, Inc. v. United Capitol Insurance Company,* 845 F.Supp. 428 (W.D.Mich.1993), the insured was sued by its customer for negligently installing a gasoline containment system on the customer's property. The system failed as a result of the alleged negligent installation which resulted in contamination of the surrounding ground water and soil.

In *Underwriters At Interest v. SCI Steelcon,* 905 F.Supp. 441 (W.D.Mich. 1995), the insured was sued for alleged faulty workmanship in the construction of a building, which led to the damage of several aircrafts from a leaking roof erected by the insured.

In *Fresard v. Michigan Millers Mutual Insurance Company,* 414 Mich. 686, 327 N.W.2d 286 (1982), the insured was a builder who constructed a house in a new development. Upon the home's completion, the residents experienced excess water in the basement, foundation deterioration, collapse of concrete floors and the cave-in of walls. Ultimately, a new drainage system had to be installed.

In *Hawkeye–Security Insurance Company, v. Vector Construction Company,* 185 Mich.App. 369, 460 N.W.2d 329 (1990), the insured was a concrete contractor and was hired by its customer to do all of its concrete work. After the concrete had been made and poured by the insured, it was discovered that the concrete did not comply with project specifications. Consequently, the 13,000 yards of concrete had to be removed and re-poured.

The common thread running through all of these cases is either that the product or property upon which the insured was working was defective as a result of something the insured improperly did or failed to do (i.e., the concrete, the drainage system, etc.); or, the insured's repair, installation, or construction of a structure, machine or system, resulted in damages because of something the insured did or failed to do (i.e., air conditioning unit repair, roof construction, gas containment system installation, etc.).

In this case, there are no allegations that GMR was negligent in its reassembly of the milling machine. And, the j(6) exclusion requires that "your work" be incorrectly performed "on it" for coverage to be denied.

The inclusion of the words "on it" would require that the particular part in question be damaged because of incorrect performance of "your work" on that particular part.

In this case, it appears that at the time of the accident the only part which was

being touched by Mr. Bachleda was a small motor that he was backing off its shaft. At that time he was not performing any work on the "B" axis onto which the "A" axis fell. There was no work "incorrectly performed" on these axis—the property damaged.

■ Cincinnati seems to argue that "your work" relates to the entire machine and seeks to avoid a guarantee of workmanship with respect to the entire machine. Although much of the machine was damaged, the work which was being performed at the time of the loss was performed only with respect to the motor which was being pulled away from its shaft for the sole purpose of avoiding a "runaway" motor when power was connected to the unit. To the extent that the definition of "your work" is ambiguous, it must be construed against Cincinnati. However, it is not ambiguous, because the definition of "your work" which, with respect to actual, physical, property such as a machine means "b. materials, parts, or equipment *furnished* in connection with such work or operations, requires that the materials, parts or equipment which formed the part of "your work" must be "furnished in connection with such work." Galaxy did not "furnish" the motor, its shaft or any other part of the machine.

The decision by the Michigan Court of Appeals in *Radenbaugh v. Farm Bureau General,* 240 Mich.App. 134, 610 N.W.2d 272 (2000), is instructive as well. In *Radenbaugh,* the Court addressed head-on, an argument raised here by CIC; namely, that the fact that FIC has claimed negligence on the part of GMR in the underlying state court action is a claim of "faulty workmanship" by FIC against GMR, which would automatically trigger the j(6) exclusion. Although *Radenbaugh* involved a defective product claim, it cited approvingly to the Sixth Circuit decision in *Bun-*

*dy,* which rejected defendant's argument that an "occurrence" cannot arise based on the insured's negligence or breach of warranty. The *Bundy* court stated:

> The fact that the claims here involve breach of warranty or negligence did not remove them from the category of accident. Bundy would not be legally obligated to pay a claim arising out of an accident occurring without its negligence or breach of warranty. *If the liability policy were construed so as to cover only accidents not involving breach of warranty or negligence, then no protection would be given to the insured.* The insured would not need liability insurance which did not cover the only claims for which it could be held liable. The word "accident" is common in most liability policies and should not be construed in this type of case as not including claims involving negligence or breach of warranty.

*Id.,* at 153, 610 N.W.2d 272 (emphasis added).

*Radenbaugh* then went on to hold that:

> *Bundy* stands for nothing more than the proposition that an insurer must defend and may become obligated to indemnify an insured under a general liability policy of insurance that covers losses caused by 'accidents' where the insured's faulty work product damages property of others.

*Id.,* at 147.

The Court finds that the damaged portions of the Profiler did not need to be repaired, replaced or restored as a result of GMR "incorrectly" working on the machine (i.e., improperly assembly, faulty installation), but rather because the brake became mistakenly disengaged, allowing the machine part to fall.

Damage here was to the property of Visoneering, and resulted in loss of business for Visioneering. Accordingly, the Court finds that Exclusion j(6) is inapplicable.

## V. *CONCLUSION*

Based on the foregoing, Plaintiff's Motion for Summary Judgment is **DENIED,** Defendant Galaxy's Motion for Summary Judgment is **GRANTED,** and Defendant Federal's Motion for Summary Judgment is **GRANTED**. Accordingly, this Court declares that CIC has a duty to defend and to indemnify GMR in the pending state court action.

**IT IS SO ORDERED.**